UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
LIA DEVITRI, et al.,            )
                                )
          Petitioners/Plaintiffs, )
                                )
        v.                      )          Civil Action
                                )          No. 17-11842-PBS
CHRIS CRONEN, et al.,           )
                                )
          Respondents/Defendants. )
_____)
```

**MEMORANDUM AND ORDER**

November 27, 2017

Saris, C.J.

**INTRODUCTION**

Petitioners are fifty-one Indonesian Christians who fear religious persecution in Indonesia and are subject to final Orders of Removal. All Petitioners reside in New Hampshire. In 2010, Immigration and Customs Enforcement ("ICE") instituted a humanitarian program called Operation Indonesian Surrender, through which Petitioners were granted Orders of Supervision, allowing them to seek employment and subjecting them to certain mandatory conditions. Petitioners also received temporary stays of removal that were renewed over multiple years. In the summer of 2017, these individuals were informed that they would be removed from the United States. They filed this habeas petition

pursuant to 28 U.S.C. § 2241,[1] raising claims under the
Immigration and Nationality Act ("INA"), the United Nations
Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment ("CAT"), and the Due Process Clause of
the Fifth Amendment of the United States Constitution.
Petitioners seek stays of their removal so that they are not
removed before they have the opportunity to file motions to
reopen based on "changed country conditions."

The Court temporarily stayed removal to determine if the
Court has jurisdiction. An evidentiary hearing was held on
October 20, 2017, at which Respondent Timothy Stevens, an ICE
Supervisory Detention and Deportation Officer with knowledge of
Operation Indonesian Surrender, testified. In advance of the
evidentiary hearing on jurisdiction, the Court also received
affidavits from Russell F. Hilliard, Esq. (Docket No. 49-1),
Reverend Sandra Pontoh (Docket No. 49-2), William Hahn, Esq.
(Docket No. 49-3), Susan Church, Esq. (Docket No. 49-4), Trina
A. Realmuto (Docket No. 49-5), and Jeffrey A. Winters, Ph.D.
(Docket No. 49-6). The Court received declarations from The
Honorable Jill H. Dufresne (Docket No. 36-1) and Christopher
Gearin (Docket No. 36-2). The only issue before the Court is

---

[1]     They also assert jurisdiction under 28 U.S.C. § 1331.

whether the Court has subject-matter jurisdiction. The Court holds that it does.

## FACTUAL BACKGROUND[2]

Petitioners are fifty-one Christian Indonesian nationals who have lived in the United States for many years. They are all subject to final Orders of Removal. Some individuals have children or spouses who are United States citizens; some have children who are recipients of Deferred Action for Childhood Arrivals ("DACA"); some have children who have enlisted in the United States military; and some have serious medical conditions.

Petitioners claim that, if they are removed to Indonesia, they will face an "alarmingly high and increasing" risk of persecution, including "intimidation, physical harm, and threats to their personal safety and well-being," based on their Christian religion. Winters Aff. (Docket No. 49-6) ¶ 2. Indonesia is a majority Muslim country. According to Petitioners' expert, since 2008, the conditions in Indonesia for religious minorities have deteriorated substantially, as the

---

[2]     The facts are taken from the allegations in the Second Amended Class Petition for Writs of Habeas Corpus and Mandamus and Class Complaint for Declaratory and Injunctive Relief ("SAC") (Docket No. 44), the documents, affidavits, and declarations produced in this litigation, and the evidence presented at the evidentiary hearing. They are largely undisputed.

country experiences a "rising tide of extremist Islam" targeting non-Muslim populations. Winters Aff. (Docket No. 49-6) ¶¶ 8-9. The Winters affidavit details numerous examples of violence carried out by Islamic militants directed at Christians, including the burning of churches, riots, and assaults. The affidavit also presents evidence from reports showing that law enforcement in Indonesia is unlikely to provide meaningful protection to religious minorities in the face of violence and intolerance.[3]

In 2010, in communication with members of the Christian community, ICE began a program called Operation Indonesian Surrender in New Hampshire. For a few weeks in 2010, ICE set up a mobile command center in the parking lot of the Strafford County district courthouse in Dover, New Hampshire. Indonesian nationals with final removal orders were encouraged to identify themselves to ICE either at the mobile command center or soon

---

[3]    At least two circuits, including the First Circuit, have recently found that conditions for Christians in Indonesia may warrant relief from removal. See Salim v. Lynch, 831 F.3d 1133, 1138-39 (9th Cir. 2016) (holding that Indonesian Christian's motion to reopen "more than me[t] the burden of proof required to establish changed country conditions"); see also Panoto v. Holder, 770 F.3d 43, 46-48 (1st Cir. 2014) (finding that bombs planted at church in late 2000 and religiously motivated ferry hijacking in June 2001 could support finding of past persecution).

afterward.[4] In exchange, the program participants were placed
under Orders of Supervision ("OSUPs") and granted temporary
stays of removal. These OSUPs allowed the participants to seek
employment and also prescribed conditions with which the
recipients had to comply, including "appear[ing] in person at
the time and place specified, upon each and every request of
[ICE] for identification and for deportation or removal," e.g.,
Docket No. 37-2 at 85, informing ICE before traveling outside
New England, and submitting to medical or psychiatric
examinations at ICE's request. Petitioners received no oral or
written promises that they could remain in this country
indefinitely.

Approximately 100 Christian Indonesians are believed to
have participated in the program and received OSUPs. They lived
and worked under these OSUPs without incident until this year
and generally complied with their conditions, including the
condition that they not commit crimes. In addition, Petitioners

---

[4]    Whether Indonesian citizens who surrendered later were
treated the same is in dispute. Attorney Russell F. Hilliard
states that, in May 2011, Officer Stevens offered to accept
surrenders of additional Indonesians living in New Hampshire and
told Hilliard that "the process [they] followed last fall is
available to anyone at any time." Hilliard Aff. (Docket No. 49-
1), Ex. B. At the evidentiary hearing, Officer Stevens testified
that, unlike the first group of participants, people who
surrendered later were not given an initial 90-day period to
file their stay requests.

were granted temporary stays of removal by ICE on a roughly
annual basis.

In late 2011, a group of program participants who did not
have U.S. citizen children, U.S. citizen spouses, or health
issues were told that they would be removed. They were informed
that their stay requests were being denied, but they were given
the opportunity to have an in-person interview with ICE at its
Manchester, New Hampshire office before removal. After the
interviews, ICE mailed the participants a notice revoking their
OSUPs and confirming their departure from the United States
approximately 90 days later.

Six years later, in February 2017, ICE began to notify
Petitioners that it would no longer grant stays of removal. ICE
advised pastoral leaders in June 2017 that it would be
terminating Operation Indonesian Surrender. At this meeting, the
leaders were informed that all remaining program participants
would be deported, but ICE did not set a timeline for these
removals. Based on the community's experience in 2011, the
pastoral leaders believed that interviews would be scheduled
with Petitioners before they were deported.

Instead, at an August 1, 2017 check-in appointment pursuant
to the OSUP conditions, a group of program participants were
told that they would be subject to a "30-30" schedule. They
would need to report to ICE at their next 30-day check-in with

6

tickets to depart for Indonesia 30 days later. This proposed class action habeas corpus petition was first filed on September 25, 2017, two days before the first Petitioners were scheduled to be removed. See Docket No. 1.

## DISCUSSION

### I.   Habeas Jurisdiction

Petitioners assert that this Court has habeas jurisdiction under 28 U.S.C. § 2241(c). In order to bring a habeas petition, an individual must be in custody. 28 U.S.C. § 2241(c). "Custody" is not limited to physical detention. See Rumsfeld v. Padilla, 542 U.S. 426, 437 (2004). Final orders of removal have been held to satisfy the custody requirement. See Rosales v. Bureau of Immigration and Customs Enforcement, 426 F.3d 733, 735 (5th Cir. 2005); Mendonca v. I.N.S., 52 F. Supp. 2d 155, 159 (D. Mass. 1999), aff'd, 201 F.3d 427 (1st Cir. 1999). An alien challenging the conditions of his immigration OSUP also may be in custody for habeas purposes. See Ali v. Napolitano, Civil Action No. 12-11384-FDS, 2013 WL 3929788, at *4-5 (D. Mass. July 26, 2013) (finding petitioner was in "custody" where he challenged the restraints on his liberty in his OSUP).

Petitioners are subject to both final Orders of Removal and OSUPs granted to them as part of Operation Indonesian Surrender. Although Petitioners need not be physically detained to be in "custody," in order for the Court to exercise habeas

7

jurisdiction, Petitioners must challenge the legality of that non-detention custody. See 28 U.S.C. § 2241(c)(3) (stating detainee must be "in custody in violation of the Constitution or laws or treaties of the United States"). In the cases finding that removal orders placed an alien in custody for section 2241 purposes, those aliens were challenging the constitutionality of their removal orders. See Rosales, 426 F.3d at 735–36 (finding alien under removal order was in custody where he was challenging removal order on due process grounds); Mendonca, 52 F. Supp. 2d at 159, 161–62 (finding alien under removal order was in custody, but declining to exercise jurisdiction because petition challenged discretionary decision). The same is true in the OSUP context. See Alvarez v. Holder, 454 F. App'x 769, 772–73 (11th Cir. 2011) (finding alien under OSUP was in custody where he challenged order's conditions on "due process, freedom of association and freedom of speech" grounds); Ali, 2013 WL 3929788, at *4–5 (finding alien under OSUP was in custody where he challenged order's condition that he report to ICE office indefinitely).

Here, Petitioners "challenge a condition of [their] custody, specifically, ICE's abrupt change in policy regarding participants in 'Operation Indonesian Surrender' and the unfairly compressed timetable of the issuance of the Denials of Stays and/or Notices of Revocation of Release." SAC ¶ 13.

Essentially, Petitioners argue that the sudden policy change, combined with the 30-30 order, is "preventing [them] from exercising their due process rights" and their statutory right to move to reopen. SAC ¶ 13. Since Petitioners' challenge is tied to a term of their OSUPs, habeas jurisdiction is proper.

Although Petitioners are in "custody" for habeas purposes, Congress has stripped all federal courts of jurisdiction over section 2241 petitions that challenge certain immigration actions:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). This jurisdictional bar, while absolute, has been held to apply only to ICE's discretionary decisions in the three enumerated categories, including the decision "to execute removal orders." See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482–83 (1999) (limiting reach of provision to "three discrete actions"). Circuit courts have held, however, that the enumerated list includes additional discretionary decisions made in furtherance of one of the "three discrete

actions." See, e.g., Moussa v. Jenifer, 389 F.3d 550, 554 (6th Cir. 2004) ("[A] denial of a stay of deportation is a component of the decision to execute a deportation order."); Mapoy v. Carroll, 185 F.3d 224, 228 (4th Cir. 1999) (noting that challenge to denial of stay "clearly arose" from decision to execute removal order and was not within court's jurisdiction).

## II.  **Motion to Reopen**

Petitioners concede, as they must, that this Court has no jurisdiction to review the decision to execute their removal orders, but they argue that they have a statutory right to move to reopen based on changed country conditions that arose after the Orders of Removal became final.

Congress mandated that ICE may not remove an alien to a country if the government decides that "the alien's life or freedom would be threatened in that country because of the alien's . . . religion." 8 U.S.C. § 1231(b)(3)(A). The duty not to remove is triggered when the alien demonstrates that "it is more likely than not that he or she would be persecuted on account of . . . religion" if removed to a particular country. 8 C.F.R. § 208.16(b)(2). Mandatory relief from deportation under 8 U.S.C. § 1231(b)(3)(A) can be based on "changed country conditions" established through a motion to reopen. 8 U.S.C § 1229a(c)(7)(C)(ii).

Under the CAT, the United States also has an obligation not to remove aliens to countries where they will be tortured. See 8 C.F.R. § 208.16(c). The regulations implementing the government's obligations under the CAT state that if an alien "is more likely than not to be tortured in the country of removal," he or she "shall be granted withholding of removal" or, at the very least, deferral of removal. Id. § 208.16(c)(4).

Claims for withholding of removal under 8 U.S.C. § 1231(b)(3) or the CAT may be adjudicated in a motion to reopen.[5] See 8 C.F.R. §§ 1003.2(c)(3), 1003.23(b)(4). In 1996, Congress codified the right to file a motion to reopen, "transform[ing] the motion to reopen from a regulatory procedure to a statutory form of relief available to the alien." Dada v. Mukasey, 554 U.S. 1, 14 (2008); see also 8 U.S.C. § 1229a(c)(7)(A). "The motion to reopen is an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings."

---

[5]   Petitioners also argue that they may be eligible for asylum, which can be raised in a motion to reopen, see 8 C.F.R. §§ 1003.2(c)(3), 1003.23(b)(4), based on the circumstances faced by Christians in Indonesia. When an alien receives asylum status, ICE "shall not remove or return the alien to the alien's country of nationality." 8 U.S.C. § 1158(c)(1)(A). To petition successfully for asylum, an alien must demonstrate "a well-founded fear of persecution." Id. § 1101(a)(42); see also I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 449-50 (1987) (interpreting meaning of "well-founded fear"). The record is unclear on whether all the Petitioners already have filed for asylum and been rejected or whether they are seeking asylum for the first time.

Kucana v. Holder, 558 U.S. 233, 242 (2010) (quoting Dada, 554 U.S. at 18). The Supreme Court has characterized the statute as creating an absolute, non-negotiable right: "[E]very alien ordered removed from the United States has a right to file one motion to reopen his or her removal proceedings." Dada, 554 U.S. at 4-5 (citing 8 U.S.C. § 1229a(c)(7)). The right to file a motion to reopen typically must be exercised within 90 days of receiving a final removal order. 8 U.S.C. § 1229a(c)(7)(C)(i). However, Congress explicitly set "no time limit on the filing of a motion to reopen . . . based on changed country conditions . . . if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." Id. § 1229a(c)(7)(C)(ii).

Whether a motion to reopen is actually adjudicated depends on the alien's continued presence in the country. If an alien is deported prior to filing, a motion to reopen cannot be made by the alien or on her behalf. 8 C.F.R. §§ 1003.2(d), 1003.23(b)(1). Furthermore, an alien's removal from the United States while a motion to reopen is pending "shall constitute a withdrawal of such motion." Id. §§ 1003.2(d), 1003.23(b)(1).

The difficult question is how to reconcile the jurisdiction-stripping provision in 8 U.S.C. § 1252(g) with the statutory right to move to reopen in 8 U.S.C. § 1229a(c)(7). Section 1252(g) must be read in conjunction with the rest of the

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which includes 8 U.S.C. § 1229a(c)(7), the statutory right to file a motion to reopen. The Supreme Court has noted that the text of 8 U.S.C. § 1229a(c)(7) "is plain insofar as it guarantees to each alien the right to file one motion to reopen proceedings . . . ." Dada, 554 U.S. at 15 (emphasis added) (internal quotation marks omitted). In Dada, where the plain text of a different section involving voluntary departures did not explicitly abolish the right to move to reopen, the Supreme Court was "reluctant" to assume that the statute was designed to remove this important safeguard. Id. at 18.

The problem for Petitioners, though, is that section 1252(g) states unambiguously that "notwithstanding any other provision of law" the Court shall not have jurisdiction to hear any claim arising from a decision by the government to execute a removal order.

On the other hand, the problem for the government is that if section 1252(g) effectively ensures that this group of Indonesian Christians cannot effectively file their claims of possible persecution and torture before being removed to the country where they are at risk, it would be an unconstitutional deprivation of the statutory right to move to reopen without due process of law because there would be no meaningful opportunity

to be heard on the motion to reopen. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965))). As stated above, once she is removed, an alien may not file a motion to reopen and any motion to reopen previously filed is deemed withdrawn under the agency's regulations.

One court has held that applying section 1252(g) in a way that eliminates the right to habeas relief in circumstances similar to this case is a violation of the Suspension Clause. See Hamama v. Adducci, No. 17-cv-11910, 2017 WL 2953050, at *12 (E.D. Mich. July 11, 2017) (holding that enforcing section 1252(g) against Iraqi Christians who could not realistically file motions to reopen, but claimed that they would face "death, torture, or other persecution" if removed, "would amount to a suspension of the right to habeas corpus").

The Suspension Clause of the United States Constitution dictates that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. Congress may decide to create adequate and effective alternatives to habeas corpus relief without offending the Suspension Clause. See I.N.S. v. St. Cyr, 533 U.S. 289, 314 n.38

14

(2001) ("Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals."); Swain v. Pressley, 430 U.S. 372, 381 (1977) (holding that "the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus").

Despite the jurisdiction-stripping language of 8 U.S.C. § 1252(g), this Court concludes that it has subject-matter jurisdiction under both 28 U.S.C. § 2241 and 28 U.S.C. § 1331 to ensure that there are adequate and effective alternatives to habeas corpus relief in the circumstances of this case. If the jurisdictional bar in 8 U.S.C. § 1252(g) prevented the Court from giving Petitioners an opportunity to raise their claims through fair and effective administrative procedures, the statute would violate the Suspension Clause as applied.

III. **The Effectiveness and Adequacy of the Administrative Procedure**

The government has introduced evidence to support its position that it has procedures in both the Immigration Court and Board of Immigration Appeals ("BIA") that ensure a full administrative process to handle any motion to reopen and

accompanying emergency motion to stay removal.[6] See Dufresne

Decl. (Docket No. 36-1) ¶¶ 13-19 (describing emergency motion

for stay adjudication process for Immigration Court); Gearin

Decl. (Docket No. 36-2) ¶¶ 9-17 (describing same for BIA).

Petitioners disagree, arguing that the procedures are

insufficient to promptly adjudicate the emergency stays

necessary to keep aliens in the country while their motions to

reopen are pending. See Realmuto Aff. (Docket No. 49-5) ¶¶ 13-25

(detailing obstacles to obtaining emergency stays of removal in

Immigration Court and BIA).

Emergency stay requests most often are filed by detained

aliens, and the Boston Immigration Court has two Immigration

Judges and staff assigned to the "detained docket."[7] Dufresne

Decl. (Docket No. 36-1) ¶ 14. The government presents evidence

---

[6]    It is not clear from the existing record whether all
Petitioners would first file their motions to reopen in the
Immigration Court or whether some would file motions to reopen
with the BIA in the first instance.

[7]    Judge Dufresne states in her declaration that the Boston
Immigration Court is aware of this pending action and the
possibility that Petitioners will file emergency stay requests.
Dufresne Decl. (Docket No. 36-1) ¶ 19. "[T]he Court
Administrator has instructed court staff to be watchful for stay
motions accompanied by a motion to reopen and to bring any such
motion and stay request to an Immigration Judge's attention
immediately." Dufresne Decl. (Docket No. 36-1) ¶ 19. In
contrast, the BIA will only consider a stay request on an
expedited emergency basis if the alien is in physical custody.
Gearin Decl. (Docket No. 36-2) ¶¶ 9-10; see also Realmuto Aff.
(Docket No. 49-5) ¶ 14.

that when the detained docket staff receive a motion to reopen
and accompanying emergency motion for stay, they "take immediate
action" to provide the Immigration Judge with the motion, stay
request, and record of prior proceedings. Dufresne Decl. (Docket
No. 36-1) ¶ 15. Judge Dufresne states that an Immigration Judge
will generally rule on an emergency stay request within one to
three days of receiving the motion and will do her best to
consider the request before a scheduled removal date. Dufresne
Decl. (Docket No. 36-1) ¶ 17. If a stay request is granted, ICE
is immediately informed by the Immigration Court. Dufresne Decl.
(Docket No. 36-1) ¶ 18.

A stay is not guaranteed during the pendency of a motion to
reopen. It is discretionary and decided by the Immigration Judge
on a case-by-case basis. Dufresne Decl. (Docket No. 36-1) ¶ 16;
see also Gearin Decl. (Docket No. 36-2) ¶ 7 (noting that, at BIA
level, stay during motion to reopen adjudication is also
discretionary). In ruling on the stay request, an Immigration
Judge will consider "the facts and circumstances of the alien's
case and the basis for the alien's motion to reopen." Dufresne
Decl. (Docket No. 36-1) ¶ 11. The Immigration Judge may also
consider "the possibility that a stay request or motion may have
been prepared and submitted without the alien (or his or her
attorney) having sufficient time to obtain . . . all appropriate

evidence in support of the stay request or motion to reopen."
Dufresne Decl. (Docket No. 36-1) ¶ 16.

Petitioners present evidence that, despite the procedures
intended to streamline emergency stay requests, delays occur.
See Realmuto Aff. (Docket No. 49-5) ¶¶ 13-23. Attorney Realmuto
has experienced delays in docketing motions and stay requests at
the BIA level. Realmuto Aff. (Docket No. 49-5) ¶ 16.
Additionally, Petitioners claim that "whether the BIA will
adjudicate a stay motion prior to deportation relies entirely on
the deportation officer's discretionary act of communicating to
the BIA the actual date and time of deportation." Realmuto Aff.
(Docket No. 49-5) ¶ 18. Attorney Realmuto cites "at least two
cases where ICE affirmatively informed the BIA of particular
deportation dates but subsequently -- unbeknownst to the BIA,
and without providing the BIA any notice -- moved up the dates
of deportation and carried out the removal." Realmuto Aff.
(Docket No. 49-5) ¶ 21. Petitioners state that "there is no
formal mechanism by which ICE is required to notify the BIA of a
change in deportation date and, therefore, no way to ensure that
the BIA has a meaningful opportunity to adjudicate the stay
motion before deportation." Realmuto Aff. (Docket No. 49-5) ¶
21. In the Immigration Court, Attorney Realmuto cites delays in
receipt of motions for stay, reluctance to rule until
deportation is imminent, and dependence on immigration judges'

schedules as obstacles to adjudication before removal. Realmuto Aff. (Docket No. 49-5) ¶ 23.

I find that the Immigration Court's procedures typically are an adequate and effective administrative alternative to habeas corpus relief consistent with the Suspension Clause. The procedures in the Immigration Court will also likely be adequate for Petitioners, who at this point are represented by attorneys in a high-profile case, so long as they receive from this Court a reasonable time period for filing the motions to reopen to which they are entitled.[8] The Court is concerned, however, that the BIA's procedures for considering emergency stay requests will not apply to Petitioners because they are not in physical custody. The government shall inform the Court whether Petitioners, who are not detained, will have access to emergency procedures if they must file their original motions to reopen with the BIA. Without a better record, the Court is not prepared to rule that the BIA's procedures are an adequate and effective administrative alternative to habeas corpus relief for non-detained persons.

The Court must determine how much time is necessary to file an adequate motion to reopen. Exercising jurisdiction to grant

---

[8]     The Immigration Court's administrative procedures may be inadequate and ineffective in an individual Petitioner's case, however.

Petitioners time to effectively use the required administrative
process is consistent with Congressional intent. Cf. Singh v.
Gonzales, 499 F.3d 969, 979-80 (9th Cir. 2007) (noting that
habeas relief in petitioner's case only would result in thirty
days to file a petition with court of appeals, as required by
statute, "which is consistent with Congressional intent
underlying the REAL ID Act").

The government argues that Petitioners had plenty of time
to file the motions to reopen prior to the August 1, 2017
notification. Petitioners argue that the denials of their stay
requests earlier in 2017 did not put them on notice that removal
was imminent or that the conditions of their OSUPs had changed,
because people may remain under OSUPs for years after stay
requests are denied. They maintain that, until the 30-30 order,
they did not know that deportations would occur so quickly. The
Court finds that Petitioners were reasonable in relying on their
protected status as long as they complied with the terms of
their OSUPs. However, after August 1, 2017, any reliance was no
longer reasonable. The Court finds that the August 1, 2017
notification that the protected status would terminate triggered
the obligation to file motions to reopen.

Petitioners argue that they need six to twelve weeks after
their attorneys receive their comprehensive files containing
their full immigration history ("A-files") to prepare adequate

motions to reopen.[9] <u>See</u> Realmuto Aff. (Docket No. 49-5) ¶ 12.
Additionally, Petitioners seek a stay of their removal pending
appeal: they ask for an injunction against removal to remain in
effect until the Immigration Court, BIA, and the First Circuit
all have reviewed their motions to reopen. <u>See</u> SAC ¶ H.

The focus in the motions to reopen is on the changed
country situation. Petitioners have already filed an expert
affidavit on the changes in conditions in Indonesia since 2008,
<u>see</u> Winters Aff. (Docket No. 49-6), so the need for the A-file
is not necessarily persuasive unless an individual can show a
specialized need (like litigation over asylum based on personal
circumstances that make targeting more likely). The statute
seems to suggest that 90 days from August 1, 2017 might be an
appropriate minimum timeframe for assembling a motion to reopen,
<u>see</u> 8 U.S.C. § 1229a(c)(7)(C)(i) (setting typical time limits
for motion to reopen); therefore, the 30-30 order is inadequate.
Furthermore, Congress recognized that a longer time period may
be appropriate when there is proof of changed country
circumstances. <u>See</u> <u>id.</u> § 1229a(c)(7)(C)(ii) (setting "no time
limit" on motion to reopen based on changed country conditions).

---

[9]    The Court has ordered the government to produce the A-files
forthwith. <u>See</u> Docket No. 58. However, the Court has no record
as to how many A-files have been produced thus far. The Court
also indicated that Petitioners' attorneys should review the
record of prior proceedings in the Immigration Court if
necessary. <u>See</u> Docket No. 58.

The government has fourteen days to file an opposition to the motion for preliminary injunction (Docket No. 3). The Court believes it has an adequate record for determining a reasonable time period to file a motion to reopen, but the government has not had a chance to respond to the motion for preliminary injunction. Also, the government shall clarify whether any Petitioners must file motions to reopen before the BIA and whether there will be an opportunity to have an emergency stay request addressed prior to removal.

## ORDER

For the foregoing reasons, this Court finds that it has subject-matter jurisdiction over Counts I and II in the SAC. This Court dismisses without prejudice Count III addressed in the companion case. See Rombot v. Souza, 1:17-cv-11577-PBS, Docket No. 49; Docket No. 52. The government is hereby temporarily enjoined from removing all Petitioners named in the SAC until the Court rules on the motion for preliminary injunction or until further order of the Court.

SO ORDERED.

                              /s/ PATTI B. SARIS
                              Patti B. Saris
                              Chief United States District Judge