# EXHIBIT B

LIA DEVITRI, et al.,

Petitioners/Plaintiffs,

v.                                                                    Civil Action No.17-cv-11842-PBS

CHRIS M. CRONEN, et al.,

Respondents/Defendants.

## AFFIDAVIT OF PROFESSOR DANIEL KANSTROOM

I, Professor Daniel Kanstroom, under oath, depose and say as follows:

1. I am an adult resident of Massachusetts and make this affidavit based upon my own knowledge. I have personal knowledge of the facts in this Affidavit, and would be competent to testify thereto.

2. I am a tenured Professor of Law and Thomas F. Carney Distinguished Scholar at Boston College Law School. I am also a Co-Director of the Center for Human Rights and International Justice at Boston College. I write in my personal capacity and not on behalf of Boston College. I have taught U.S. Immigration Law at Boston College Law School and at many other universities and law schools, including American University, Northeastern School of Law, the University of Hawai'i, and Vermont Law School, for more than twenty-five years. I am the author of many law review articles about U.S. Immigration Law as well as two books: *Aftermath: Deportation Law and the New American Diaspora* (Oxford University Press 2012) and *Deportation Nation* (Harvard University Press 2007).

3. In 2006, I co-founded the Post-Deportation Human Rights Project (PDHRP) at Boston College. The essential purposes of PDHRP were to conceptualize post-deportation law as

a distinct legal subject and to support the rights of deportees and their family members through research, policy analysis, human rights advocacy, and training programs. The Project undertakes multi-disciplinary research into the effects of deportation in the U.S. and abroad. PDHRP attorneys—sometimes together with *pro-bono* counsel and law students—also advise, counsel, and represent persons who have been deported. Over the past twelve years we have fielded many inquiries and represented clients from Guatemala, Haiti, El Salvador, Honduras, Ecuador, Chile, The Azores, Nigeria, the Congo, Bangladesh, Egypt, Cambodia, and many other countries. We have appeared before administrative agencies, immigration courts, U.S. district courts, and U.S. courts of appeals. Much of our work—as a matter of research, training, and in actual practice—has involved motions to reopen removal proceedings after a person has been removed from the United States.

4. In sum, I have focused for more than a decade of my scholarly and professional legal work on the rights and prospects of those who have been deported from the United States.

5. I make this affidavit in support of Petitioners in this matter because, based on my experience and my research, I conclude that the harm that they would experience if deported prior to adjudication of their motions to reopen would very likely be irreparable.

6. Aside from the most obvious possible irreparable harm—the possibility of their facing persecution, torture, or death in Indonesia—I am certain that removal from the United States prior to full preparation with competent counsel and adjudication of their motions to reopen would be exceedingly difficult for these Plaintiffs, both substantively and procedurally. First, preparing their motions while also attempting to avoid persecution or torture would be exceedingly difficult. Second, even under less dangerous circumstances, we have found it extremely difficult in such cases to maintain contact with clients, to

communicate effectively, to obtain necessary evidence, to assure the accuracy of facts and documents, to advise about the law, etc. Moreover, in some cases, even successful adjudication is just the beginning of a long, expensive, complicated and dangerous process of return. This may involve obtaining the consent of the government of the country to which the person was deported or in which they reside. It also involves strikingly opaque and often complex and contradictory bureaucratic processes by (often recalcitrant) US immigration agencies as to how a person may be returned even if the case is successfully re-opened.

7. Given these difficulties, I believe that a post-deportation motion to reopen in the circumstances faced by the Plaintiffs in this matter would be much less likely to prevail than if such a motion were pursued within U.S. territory.

***Post-Deportation Motions to Reopen***

8. One of the main reasons that the Post-Deportation Human Rights Project (PDHRP) was begun more than a decade ago was because the government interpreted certain regulations to completely bar most post-departure motions to reopen. This meant that many claims of legal error were impossible to redress. As the Board of Immigration Appeals put it, "[r]emoved aliens have, by virtue of their departure, literally *passed beyond our aid.*" *Matter of Armendarez-Mendez*, 24 I. & N. Dec. 646, 656 (BIA 2008) (emphasis added). Deportation, in the view of the BIA, is a "transformative event that fundamentally alters the alien's posture under the law." *Id*. at 657. As a functional matter, this means that due process and equal protection rights evaporated following removal from the United States. PDHRP, together with others, has researched and litigated many issues relating to such motions. *See e.g., Lawrence v. Lynch*, 826 F.3d 198 (4th Cir. 2016); *Carias v. Holder*, 697 F.3d 257 (2012); *Ovalles v. Holder*, 577 F.3d

288 (5th Cir. 2009); *Rosillo-Puga v. Holder*, 580 F.3d 1147 (10th Cir. 2009); *Nat'l Immigration Project of the Nat'l Lawyers Guild v. United States Dep't of Homeland Sec.*, 842 F. Supp. 2d 720 (S.D.N.Y. 2012). Our basic position is that removal should not mean the loss of all rights, especially where a person has been deported in error.

9. Although we do not have complete, accurate statistics on all post-deportation motions to reopen, PDHRP endeavors to closely monitor such cases. We field inquiries from attorneys and legal clinics around the country and from potential clients around the world.

10. Motions to reopen before the BIA based on changed country conditions are generally decided without oral argument. The applicable statute and regulations require that the motion to reopen be submitted with evidence showing that circumstances have changed since the last immigration hearing. *See* 8 U.S.C. § 1229a(c)(7)(B) ("The motion shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by the affidavits or other evidentiary material.") Post-deportation motions to reopen based on changed conditions are especially challenging to prepare because a client may be: difficult to contact, living in fear, required to travel frequently. Indeed, a client may well may feel a justifiable need to conceal identity and intentions for the sake of personal safety. The concerns about persecution and torture in many places around the world are very real. *See, e.g.,* Geoffrey A. Hoffman, Nimra Chowdhry, & Martha Chace, *Immigration Appellate Litigation Post-Deportation: A Humanitarian Conundrum,* 5 HLRe 143 (2015) (discussing case of a deported *pro se* litigant who won remand from the Fifth Circuit on a torture claim but whose victory is meaningless because he cannot be found). This makes it extremely hard for deported

clients to work with U.S. legal counsel to review legal filings and gather the documents needed to establish entitlement to relief, especially within the deadlines provided in law.

11. Even if these Plaintiffs were somehow to succeed on post-deportation motions to reopen, it is far from clear that the U.S. government would ever actually return them because of its (still) unevenly applied and often rather discretionary "Return Policy." *See* Nancy Morawetz, *Convenient Facts:* Nken v. Holder*, The Solicitor General, and the Presentation of Internal Government Facts*, 88 N.Y.U.L. Rev. 1600 (2013). To this day, even those with successful motions to reopen face numerous challenges in effecting return. *See e.g., Return To The United States After Prevailing On A Petition For Review Or Motion To Reopen Or Reconsider* (attached hereto as Exhibit A and also available at https://www.nationalimmigrationproject.org/PDFs/practitioners/practice_advisories/fed/2015_27Apr_return-advisory.pdf ).

12. PDHRP assisted in the development of a 2014 report by New York University's Immigrant Rights Clinic, which detailed such hardships as:

- refusal of agencies to issue travel documents;

- noncitizens receiving conflicting information about return from the Department of State and the Department of Homeland Security;

- agency staff imposing limitations on the types of cases eligible for return; and

- bald refusal to effect return

*See Victory Denied: After Winning On Appeal, An Inadequate Return Policy Leaves Immigrants Stranded Abroad* (attached hereto as Exhibit B and available at: http://www.law.nyu.edu/sites/default/files/upload_documents/Victory%20Denied.pdf ).

13. In circumstances where the government of the client's home country is actively hostile to the deported, especially high-profile cases, the difficulties described in these reports

may be seriously amplified.  For example, clients may find their communications subject to compromise or surveillance, their travel restricted, their families threatened, etc. Though client confidentiality precludes a full recitation of facts, PDHRP attorneys and I have experienced this type of treatment in cases upon which we have personally worked.

14.  Although I am not an expert on Indonesia, my review of the affidavit of Professor Jeffrey Winters in this action and my decades of experience with post-deportation motions to reopen, lead me to conclude that, in this case for many of these Plaintiffs, the possibility of filing a post-deportation motion to reopen would be functionally hollow. The harms they face are irreparable, both substantively and procedurally.

Signed under the pains and penalties of perjury this 24th day of January, 2018.

Professor Daniel Kanstroom

# EXHIBIT A



**IMMIGRANT RIGHTS CLINIC**
**Washington Square Legal Services**
**at NYU SCHOOL OF LAW**



## PRACTICE ADVISORY[1]

### April 27, 2015

### RETURN TO THE UNITED STATES AFTER PREVAILING ON A PETITION FOR REVIEW OR MOTION TO REOPEN OR RECONSIDER

<u>Table of Contents</u>

I.      Introduction…………………………………………………………………………..2
II.     Background…………………………………………………………………………….2
III.    ICE's Return Directive and Implementation Challenges…………………………….4
IV.     Navigating the Return Process……………………………………………………….8
    A.      Initial Considerations:  Client Communication and Document Collection……….8
    B.      Contact and Regular Follow Up with ICE…………………………………………..9
    C.      Mechanics of ICE-Facilitated Return………………………………………10
V.      Federal Court Options………………………………………………………………11
    A.      Overview……………………………………………………………………………11
        1.      Litigation to Address ICE's Refusal to Respect a Federal or
             Administrative Court Order………………………………………….. 11
        2.      Create a Paper Trail………………………………………………...13
    B.      Where and What to File…………………………………………………………13
        1.      Complaint for Declaratory and Injunctive Relief (District Court)............13
            a.      *Administrative Procedure Act Claims*……………………………14
            b.      *Constitutional and Statutory Due Process Claims*………………14
            c.      *Mandamus*…………………………………………………….....15
        2.      Motions Requesting Return (Circuit Court)…………………………15
        3.      Mandamus (Circuit Court)…………………………………………15
VI.     Suggested Strategies for Avoiding *In Absentia* Orders in Removal Proceedings for
    Respondents Stranded Abroad……………………………………………………...16
V.      Conclusion …………………………………………………………………………17
Sample Email to ICE ERO…………………………………………………………….....18

---

[1]      Copyright (c) 2015, National Immigration Project of the National Lawyers Guild, American Immigration Council, and the Immigrant Rights Clinic, a clinic of Washington Square Legal Services at New York University School of Law (the views herein represent those of the clinic and not necessarily of the law school).  This advisory is not a substitute for individual legal advice and decision-making supplied by a lawyer familiar with a client's case.  Readers are cautioned to check for cases and legal developments.

      This advisory originally was issued on December 21, 2012 by Trina Realmuto, Jordan Wells, Alina Das, and Beth Werlin.  The advisory was updated by Trina Realmuto, Elizabeth Davis, Molly Lauterback, and Beth Werlin.

Web Addresses for Documents Referenced in this Advisory…………………………………....19

## I. **Introduction**

This practice advisory contains practical and legal suggestions for individuals seeking to return to the United States after they have prevailed on a petition for review or a motion to reopen or reconsider to the immigration court or Board of Immigration Appeals (BIA). This advisory begins with an overview of relevant developments over the past few years, including the government's issuance of a return directive in February 2012 and subsequent developments. It then covers administrative steps to return a prevailing litigant under the directive. Finally, it summarizes potential litigation options if the government refuses to facilitate or unreasonably delays return, and strategies for avoiding in absentia orders in administrative proceedings while pursuing return. The end of the advisory includes a sample email to initiate return and a list of links to the documents referenced herein.

Notwithstanding the return directive, arranging return continues to be a haphazard process—even for individuals who fit squarely within the categories of noncitizens that the Department of Homeland Security (DHS) acknowledges may return.[2] As documented in a July 2014 report, "the government's inadequate return policy, and its persistent unwillingness to repair this policy, negatively affects individual immigrants' cases and the entire process of judicial review."[3] Attorneys continue to regularly report demoralizing combinations of intransigence, confusion, and lack of coordination on the part of the agencies involved in facilitating returns. Given the significant impediments attorneys report with this process, litigants before the court of appeals are advised to request that the court order return as part of its order granting a petition for review. Litigants who prevail on a petition for review or before an immigration court or the BIA are also advised to keep detailed records of efforts to arrange return in the event that federal court action to compel return becomes necessary.

## II. **Background**

Practitioners long have reported the lack of a policy for returning clients to the United States after they prevailed in the courts. It thus came as a surprise in 2008, when the Office of the Solicitor General (OSG) represented to the Supreme Court in *Nken v. Holder*, 556 U.S. 418 (2009), that the government had a "policy and practice" of providing "effective relief" to noncitizens who prevail in their cases after being removed, by facilitating their return.[4] In its opinion, the Court relied on this representation in concluding that, for a stay of removal, "the burden of removal alone cannot constitute the requisite irreparable injury."[5]

---

[2]     *See* ICE Policy Directive, Number 11061.1 (Feb. 24, 2012).

[3]     Tianyin Luo and Sean Lai McMahon, *Victory Denied: After Winning On Appeal, An Inadequate Return Policy Leaves Immigrants Stranded Abroad*, New York University School of Law Immigrant Rights Clinic, at ii (July 2014).

[4]     Brief for Respondent at 44, *Nken v. Holder*, 556 U.S. 418 (2009) (No. 08-681).

[5]     *See Nken*, 556 U.S. at 435 (citing Brief for Respondent at 44).

Subsequently, immigration advocates filed Freedom of Information Act (FOIA) requests for information regarding the alleged policy, and when the agencies failed to turn over records, they filed a lawsuit against DHS, the Department of Justice (DOJ), and the Department of State (DOS).[6] The FOIA lawsuit revealed that the OSG had misrepresented the existence of a return policy to the Supreme Court.[7]

In the wake of these revelations, DHS rushed to demonstrate to the Supreme Court and lower courts that they subsequently had put an effective return policy in place. On February 24, 2012, Immigration and Customs Enforcement (ICE) issued a policy directive purporting to "describe[] existing ICE policy"—although notably the directive does not reference any pre-existing policies. Then in April 2012, ICE issued guidance in the form of Frequently Asked Questions (FAQ) regarding implementation of the February 2012 "policy."[8] The key government contact for facilitating return was listed as the ICE Public Advocate. At the same time, then Secretary of State Clinton sent a cable to embassies and consular offices, instructing them to refer return inquiries to ICE and to process parole notifications for persons DHS determines merit return.

With the purported "policy" barely in place, on April 24, 2012, the OSG sent a letter to the Supreme Court, acknowledging its incorrect representations in *Nken*. In the letter, the OSG urged the Court not to revisit the portion of its opinion that relied on those representations, averring that "[t]he government does not believe that any action by this Court is required," given its client-agency's recent announcements.[9]

---

[6] Complaint at 1, *Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't. of Homeland Sec.*, No. 11-CV-3235 (S.D.N.Y. filed May 12, 2011). The plaintiffs were the National Immigration Project of the National Lawyers Guild (NIPNLG), the American Civil Liberties Union, the Immigrant Defense Project, the Boston College Post-Deportation Human Rights Project, and Professor Rachel Rosenbloom. The New York University School of Law Immigrant Rights Clinic represented plaintiffs.

[7] *See Nat'l Immigration Project of the Nat'l. Lawyers Guild v. U.S. Dep't. of Homeland Sec.*, 842 F. Supp. 2d 720, 722 (S.D.N.Y. 2012).

[8] Frequently Asked Questions about ICE Policy Directive Number 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (2012) (Previous FAQ). This Previous FAQ is attached as Appendix D to the Letter from Michael R. Dreeben, cited in footnote 9 below. It has since been amended.

[9] Letter from Michael R. Dreeben, Deputy Solicitor General, to Hon. William K. Suter, Clerk of the Supreme Court (Apr. 24, 2012) ("OSG Letter"). Several immigration groups that had appeared as *amici curiae* in *Nken* responded with a letter asking the Court to "withdraw[] the parts of its *Nken* opinion that relied on representations that the government now acknowledges were inaccurate." Letter from Paul R.Q. Wolfson and Adam Raviv to Hon. William K. Suter, Clerk of the Supreme Court (May 4, 2012). Only the OSG's letter—not the letter from *Nken*'s *amici*—was acknowledged as received by the Court. *See Nken v. Holder*, No. 08-681.

In 2013, Congress voted to defund the position of ICE Public Advocate,[10] whom the Previous FAQ had identified as the coordinator of the return process.[11]  ICE subsequently issued the current FAQ.  As discussed in more detailed below, the current guidance instructs individuals or their representatives to affirmatively contact the ICE's Enforcement and Removal Operations (ERO) Outreach unit through its Detention Reporting and Information Line (1-888-351-4024) or a generic email address (ERO.INFO@ice.dhs.gov).

## III.    ICE'S Return Directive and Implementation Challenges

ICE's policy directive falls far short of providing fairness to prevailing litigants who have overcome the difficulties of litigating from abroad.  Most significantly, it covers only a subset of litigants.

- **Applies Only to Prevailing PFR Litigants.**  The directive only covers noncitizens who prevail on Petitions for Review (PFR).  It does <u>not</u> cover noncitizens who prevail on administrative motions to reopen or reconsider before an immigration judge (IJ) or the BIA.  (Strategies for returning these individuals are discussed below).

- **Applies Only to Individuals Restored to LPR Status or Whose Presence ICE Deems Necessary.**  The directive states that ICE will facilitate return only where:

  i. *The court, by vacating or reversing the removal order, restores the noncitizen to LPR status.*  Practitioners continue to report that, despite the fact that the policy is clear on this point, ICE nevertheless has refused to facilitate return in this situation.  Some practitioners have had to file a federal court lawsuit seeking to compel return.  (Note: In every lawsuit of which the authors are aware, ICE has returned the individual prior to substantive briefing and in lieu of litigating the case.)

     OR

  ii. *ICE deems, in its sole, unfettered discretion, that a non-LPR's "presence is necessary for continued administrative removal proceedings."*  There is little guidance on when ICE will deem a person's presence necessary.  The FAQ states only that presence may be necessary if "the nature of the court's decision requires [] return for further testimony" and that "ICE may explore other options in lieu of facilitating your return, such as arranging for video teleconference or telephonic testimony, if appropriate."  In accordance with the FAQ, ICE often takes the

---

[10]     *See* H.R. 5855, 113th Cong. (2013) (Floor Adopted Amendments), *available at* http://appropriations.house.gov/uploadedfiles/06.07.12_homeland_security_floor_adopted_amendments.pdf.

[11]     OSG Letter, Appendix D (Previous FAQ), at 1.

position that return is unnecessary when an immigration court hearing may take place by video or by phone.[12]

- **Return After Succeeding on Remand to the Immigration Court or Board.** If an individual is not returned after succeeding on a PFR, but ultimately overcomes the obstacles and wins his or her case while abroad, ICE will return the person when "the Board or Immigration Court enters a final and unreviewable decision that permits [the noncitizen] to be physically present in the United States."[13]

- **"Extraordinary Circumstances" Exception.** Even if a person satisfies one of the conditions described above and qualifies for return under the directive, ICE will only facilitate return "[a]bsent extraordinary circumstances." The FAQ states that these circumstances "include, but are *not limited to*, situations where the return of an alien presents serious national security considerations or serious adverse foreign policy considerations." (emphasis added). This nebulous definition delegates wide discretion to ICE and opens the door to manipulation.

- **No Pre-Return Detention Determination.** The directive notes only that it "may detain" a noncitizen upon return. The FAQ states that an individual "may be detained for further immigration proceedings" upon return depending on the case circumstances, whether the person is "subject to mandatory detention," or whether the person poses "a danger to the community or risk of flight." ICE's refusal to make a custody determination prior to return, even for noncitizens who were not previously detained or who complied with a voluntary departure order, is unsettling. Knowing whether one will be detained is a key factor in weighing the risks and rewards of return and considering the timing of return.

- **Failure to Return to and Provide Proof of Pre-Removal Status.** The directive states that ICE regards a returned noncitizen as having the immigration status that she or he had, if any, prior to the entry of the removal order. Attorneys report that persons restored to LPR status by a court order are told by ICE and/or consular posts abroad that their client is required to apply for a returning resident visa, which can take several months. Moreover, the FAQ states that ICE will not treat a returning noncitizen as an "arriving alien" unless she or he was charged as an "arriving alien" prior to removal. Nonetheless, attorneys report that ICE fails to provide returning noncitizens with proof that they are returning with their pre-removal status.

---

[12] Noncitizens forced to proceed from abroad often face problems such as limited communication with their counsel, difficulty presenting and reviewing evidence, and technological malfunctions or failures. Worse still, practitioners have reported that, where clients were unable to appear in person, IJs have closed cases or considered issuing *in absentia* orders.

[13] Although the FAQ claims that "[m]ost courts and many foreign embassies have the technology" to conduct video or teleconference hearings, there is no other indication of a system to facilitate videoconferencing from abroad. Secretary Clinton's cable to consular offices, *see* OSG Letter, Appendix E, does not contain any instruction on facilitating videoconferencing.

- **Facilitation of Return through Parole.** The directive states that ICE will "if warranted, parole the alien into the United States." The FAQ states that ICE will "work with the ICE Homeland Security Investigations Law Enforcement Parole Unit (LEPU)" to arrange proper transportation documents. To the extent that ICE is paroling in returning noncitizens who were *not* deemed "arriving aliens" prior to their removal order, this mechanism is at odds with the FAQ's promise that ICE typically will not treat returning individuals as "arriving aliens." Parolees are subject to grounds of inadmissibility under 8 U.S.C. § 1182(a) and detention without a bond hearing, *see* 8 C.F.R. § 1003.19(h)(2)(i)(B). Manner of entry issues are discussed in Part IV.C.

- **Cost-Prohibitive.** The directive states that "[f]acilitating an alien's return does not necessarily include funding the alien's travel via commercial carrier to the United States or making flight arrangements for the alien." The FAQ states that a prevailing litigant who had an administratively final order but was not granted a stay of removal "will be responsible for incurring the costs for returning to the United States to resume his or her prior immigration status and/or to continue to pursue his or her immigration case."[14] Moreover, since the transportation document that ICE or DOS issues (*see* Part IV.C) may be valid for only a week or less, the cost of a flight on such short notice can be exorbitant. Additionally, in most cases, it is necessary to retain a lawyer to navigate the return process and, if necessary, file a federal court action to compel return. This additional expense also may prevent a noncitizen from returning to the United States.[15]

---

[14] ICE has paid for travel, however, in instances where a court has ordered that the agency produce the person on a short timeframe, where the person was unlawfully deported during the pendency of the appeal period or filing of an appeal to the Board of Immigration Appeals, or where the person was unlawfully removed in violation of an administrative or judicial stay order. It is still advisable to make a written request for payment of travel costs when communicating with ICE. In addition, consider requesting that ICE cover travel as alternative relief when seeking a stay of removal and in merits briefing to the court of appeals in a petition for review.

[15] The government recently reiterated its steadfast refusal to assist with payment for return, noting that petitioners "are free to raise" this issue in a stay motion to the court of appeals. Transcript of Oral Argument, *Nat'l Immigration Project of Nat. Lawyers Guild v. U.S. Dep't of Homeland Sec.*, ECF No. 87 at 19, No. 11-CV-3235 JSR, 2014 WL 6850977 (S.D.N.Y. Dec. 3, 2014) ("And the government has been consistent in saying, when a person is removed . . . as far as making the travel arrangements and paying for the ticket, that is not the government's responsibility, and we did not make a representation about that. Now, if a person . . . believes that they will be unable to pay for their own return, they're certainly free to raise that in their stay motion to the courts, and the courts could fully vet that.").

At least two district court judges have recognized that the government's policy of not paying for the return of indigent petitioners may deny them effective relief. *Nat'l Immigration Project of Nat. Lawyers Guild v. U.S. Dep't of Homeland Sec.*, No. 11-CV-3235 JSR, 2014 WL 6850977, at *5 (S.D.N.Y. Dec. 3, 2014) ("More troubling to the Court is the government's refusal to fund the return of indigent aliens . . . For many such aliens, the financial burden of removal may, as a practical matter, preclude effective relief."); *Kabenga v. Holder et al.*, No. 14-

- **Documentation.**  The directive states that individuals returning by air or sea must have "a valid passport or equivalent documentation" and that persons returning by land must have "appropriate identity documentation, which could include a passport or other government-issued documents."  For lower income and indigent individuals and those who fear persecution in their countries of origin, this requirement may prohibit return altogether.  The FAQ states that if the country of origin will not issue the person a passport or equivalent travel document, the individual will not be able to return "via a commercial air carrier or maritime vessel."  Even when petitioners gather the necessary documentation, practitioners report that their clients have been denied entry to a plane, or instructed by CBP that they needed additional documentation not required by the directive.[16]

- **Obligation to Initiate Return on Noncitizen.**  The directive and the FAQ put the onus on the noncitizen to initiate return by affirmatively contacting ICE to request return.  Pro se litigants who are abroad (either because the court denied their stay request or they did not seek a stay) have no means of knowing that they prevailed on the petition for review let alone that they are entitled to return.[17]  For these individuals, the return process is not accessible.

- **Non-Binding and Lacking Force of Law.**  DHS has indicated that it does not intend this policy to bind agency employees or carry the force of law.  The directive explicitly states that it "does not apply to bargaining unit employees" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party."[18]

---

CV-9084, 2015 U.S. Dist. LEXIS 434, 14 (S.D.N.Y. Jan. 2, 2015) (granting stay of removal to indigent petitioner and reiterating concern about "the Government's policy of selectively financing post-removal travel").

[16]     *See*, *e*., Tianyin Luo and Sean Lai McMahon, *Victory Denied: After Winning On Appeal, An Inadequate Return Policy Leaves Immigrants Stranded Abroad*, New York University School of Law Immigrant Rights Clinic, at 22-25 (July 2014).

[17]     *See*, *e*., Geoffrey A. Hoffman, Nimra Chowdhry, & Martha Chace, *Immigration Appellate Litigation Post-Deportation: A Humanitarian Conundrum*, 5 HLR*e* 143 (2015) (discussing case of a deported pro se litigant who won remand from the Fifth Circuit on a torture claim but whose victory is meaningless because he cannot be found).

[18]     Moreover, DHS should have satisfied notice-and-comment requirements under the Administrative Procedure Act (APA), 5 U.S.C. § 553, because the directive substantively affects the people it regulates. While policy statements are exempt from notice-and-comment requirements, § 553(b)(A), legislative rules carrying the force of law are not.  *See General Electric Co. v. EPA*, 290 F.3d 377, 382-83 (D.C. Cir. 2002).

- **Subject to Change or Revocation at Any Time.** By issuing a mere statement of policy, DHS may change its position on returns at any time.[19] DHS did not publish the directive in the Federal Register, as required by the Administrative Procedure Act (APA), 5 U.S.C. § 552(a)(1)(D), and the agency retains full discretion to revoke the policy directive at any time.

In sum, the lack of an adequate return policy in the PFR context, the lack of any policy in the motion to reopen or reconsider context, the problems associated with parole, and the myriad practical obstacles to return all present significant challenges to prevailing litigants. If the directive or ICE's implementation of it prevents or unnecessarily delays a person's return, attorneys should consider filing an action in federal court as discussed below.

## IV.    Navigating the Return Process

The return process needs an overhaul, both in terms of policy and practice. In the meantime, the advice in this section may help individuals navigate the vagaries of the current process based on some common occurrences and best practices.

**The ICE directive only covers noncitizens who prevail on PFRs, but individuals who have prevailed on a motion to reopen or reconsider also can follow the steps outlined below.** Some attorneys report success with arranging return for these individuals.

### A.    Initial Considerations:  Client Communication and Document Collection

Attorneys should begin arranging return by communicating with the client about the court's decision and verifying that the person wishes to return to the United States. Timing and detention issues are important factors in making this decision.

#### *Timing*

An individual who prevails on a PFR need not wait for the mandate to issue for the court's order to take effect.[20] Unless and until the court of appeals reverses, amends, or vacates its decision, the government is bound by, and must follow, the court's existing decision.[21]

An individual who prevails on an administrative motion for reopening or reconsideration also can initiate return immediately. If an IJ granted the motion and DHS appealed the grant, DHS may refuse to return the person while the BIA appeal is pending. Such refusal may warrant a

---

[19]     *See*, *e.g.*, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (". . .[P]olicy statements are binding on neither the public, nor the agency.") (internal citations omitted).

[20]     Unless the government files a petition for rehearing or receives an extension of time for seeking rehearing, or the court stays the mandate (typically pending a petition for a writ of certiorari), the mandate will issue fifty-two days after the issuance of a decision entering judgment. Fed. R. App. P. 40(a)(1), 41(b).

[21]     *See Wedbush, Noble, Cooke, Inc. v. Securities and Exchange Commission*, 714 F.2d 923, 924 (9th Cir. 1983); *Vo Van Chau et al. v. Dep't of State*, 891 F. Supp. 650, 654 (D.D.C. 1995).

federal court lawsuit seeking to compel return.

Although one can initiate the process of return immediately, the possibility of detention upon return may affect when one decides to initiate the process.

### *Detention*

The FAQ states that "[y]ou may be detained for further immigration proceedings upon your return depending on the circumstances of your case and ICE's assessment of whether you are subject to mandatory detention under the immigration laws or should otherwise be detained because you pose a danger to the community or risk of flight." ICE generally has detained returning noncitizens who were detained prior to their removal.[22] They have refused, however, to promise that noncitizens who were *not* detained prior to their removal will be afforded the same custody status upon their return.

If feasible, a noncitizen facing a likelihood of detention upon return might consider pursuing her or his case from abroad to the extent possible, and only return once she or he is required to be present (e.g., for an individual hearing before an IJ). If ICE detains a noncitizen upon her or his return, 8 U.S.C. § 1226 should continue to govern the detention, unless another detention provision governed the person's custody status prior to removal or departure. Importantly, DHS should not treat returning noncitizens as arriving aliens—whether for custody purposes or any other purpose—unless they were arriving aliens prior to their departure or deportation from the United States.

### *Collecting relevant information and documentation*

The directive and FAQ require individuals to have a valid passport or equivalent travel document to return to the United States. These individuals also must provide ICE with certain information, which is specified in the sample letter at the end of this advisory, and includes the following: passport number and expiration date; the address and telephone number for the place where the person intends to live upon return; the closest U.S. consulate where the person can obtain necessary paperwork; and the anticipated port of entry (airport or border entry point).[23]

### B.    Contact and Regular Follow Up with ICE

The FAQ instructs individuals or their representatives[24] to affirmatively contact ERO Outreach through its Detention Reporting and Information Line (1-888-351-4024) or a generic email address (ERO.INFO@ice.dhs.gov) and claims that ICE will assign a point of contact to facilitate return. Significantly, however, because a person may need to file a federal court action to compel return, it is advisable to document all return efforts by contacting ICE via email and

---

[22]    If the court of appeals ordered removal proceedings terminated, ICE should not detain the noncitizen at all.

[23]    To determine the nearest land border, consult this list of U.S. ports of entry: http://www.cbp.gov/contact/ports, last visited: April 27, 2015.

[24]    According to the FAQ, attorneys and accredited representatives need to submit Form G-28. Other individuals seeking to assist with return need to submit an ICE Privacy Waiver Form.

cc:ing attorneys from the Office of Immigration Litigation (who litigated the PFR) and/or the ICE Chief Counsel's Office (who will represent ICE in remanded or reopened removal proceedings).

It is also advisable to complete the ICE, Enforcement and Removal Operations "ERO" Contact Form, which is available at https://www.ice.gov/webform/ero-contact-form.  A designated use for the form includes "Facilitation of Return to the U.S. for Court Proceedings."

Practitioners report that ICE may respond with unhelpful information, may take a long time to respond, or may not respond at all.  If ICE responds and agrees that a person can return, ICE is supposed to assign a point of contact to coordinate the return.  However, practitioners should expect that ICE will not timely respond or will not respond at all to a request to facilitate return, and, therefore, should regularly send follow-up emails and make phone calls, all of which should be documented in anticipation of federal court action.

### C.      Mechanics of ICE-Facilitated Return

Even in situations where ICE agrees to facilitate return, practitioners report a significant lack of coordination within and among ICE, DOS, and Customs and Border Protection (CBP).  As discussed above, ICE generally has refused to return LPRs their LPR cards so that they may use them to travel back to the United States.  And once an LPR has returned, USCIS has denied the person's I-90 application to replace her or his LPR card. If USCIS refuses to issue the card, consider asking the ICE point of contact to communicate with her sister agency to ensure that USCIS issues the card.  If this effort fails, consider evaluating federal court options.

According to the directive, ICE is supposed to engage in activities that would allow the person to travel to the United States.  The directive specifically mentions issuance of a Boarding Letter (also known as a "transportation letter") to permit commercial air travel and parole upon arrival at a U.S. port of entry.

#### *Transportation Letters*

In nearly all cases it is advisable to request issuance of a transportation letter, which generally is obtained from the nearest U.S. embassy or consulate.  This document allows a returning noncitizen to board a commercial airplane or boat to come to the United States.  Airlines will not permit passengers to board international flights without proper travel documents.  Transportation letters are addressed to passenger transportation companies and supervisory immigration inspectors at the intending port of entry.  The letters generally state that the letter holder is considered properly documented to travel to the Unites States and assure the carrier that it will not be subject to liability for transporting the person.

An individual must present a valid passport or equivalent documentation to obtain the transportation letter.  The person who issues the transportation letter may be a consular employee, an ICE attaché, or a USCIS officer stationed overseas.  Practitioners have reported confusion and delay among consular officials and miscommunication between them and ICE.

Persistence with ICE and the local U.S. embassy or consulate is the best approach to overcome this problem, in the absence of a more systemic change to the current process.[25]

### *Parole*

The directive states returning noncitizens will have the immigration status that they had, if any, prior to the entry of the removal order, and the FAQ provides that "[b]ecause ICE regards you as returning to your prior status, ICE will not treat you as an arriving alien unless you had been charged as an arriving alien prior to removal." Nonetheless, the ICE directive refers to parole as a mechanism for return, without specifying that parole would only be appropriate for those whom DHS deemed arriving aliens prior to their removal order. To the extent that both the FAQ and directive suggest that parole would be a proper mechanism for return for individuals who were not arriving aliens when they were deported, such a policy has serious, negative consequences.

First, there is no guarantee that CBP will allow the person back into the United States. CBP instructions on parole clearly provide that border officials can override a prior decision to grant parole.[26]

Second, parole does not constitute an admission, *see* 8 U.S.C. § 1182(d)(5), and parolees remain subject to grounds of inadmissibility under § 1182(a) after passing into the United States.

Third, parolees are subject to detention without a bond hearing. 8 C.F.R. § 1003.19(h)(2)(i)(B).

Fourth, parole is temporary, lasting only as long ICE authorizes. In some cases, ICE has granted parole for less than a month, even though remanded removal proceedings may last much longer. Parolees in this situation must request that ICE renew their parole, and may have to make further renewal requests as parole expiration dates approach.

In addition, there may be unpredictable adverse consequences of entering on parole. For example, if the return policy is rescinded or substantially revised in the future, it may be difficult to convince an immigration officer 10 years from now that the person returned under the policy with her or his pre-removal status.[27] Given these consequences, we strongly encourage individuals to request a transportation letter or use a valid LPR card (if possible).

If ICE insists on facilitating return via parole, one can attempt to minimize the potential consequences by requesting that ICE or CBP annotate the parole document, I-94, and/or the person's passport to reflect entry in pre-removal status. Keep in mind that when a person is being paroled in, ICE generally instructs CBP to parole the client in at a specific port of entry

---

[25]     For example, one attorney reported that ICE sent the petitioner's transportation letter to the embassy eleven days before his scheduled return date. The letter then sat in the embassy's mailroom for days. Only as a result of the attorney's follow up calls did the embassy finally locate the letter on the date the petitioner was scheduled to return.

[26]     CBP Directive No. 3340-043, at 5 (Exercise of Discretionary Authority) (Sept. 3, 2008).

[27]     Note also that immigration forms often will ask for the applicant's "manner of last entry" into the United States, *see*, *e.g.*, Application for Employment Authorization, and thus the agency would likely assume that a person who entered on parole was an arriving alien.

during a specific window of time under 8 U.S.C. § 1182(d)(5). ICE may assign a parole reference number to an individual. Again, all returning noncitizens must also possess a valid passport or equivalent documentation.

## V. Federal Court Options

### A. Overview

#### 1. Litigation to Address ICE's Refusal to Respect a Federal or Administrative Court Order

Even in the wake of its policy directive, ICE still routinely fails to facilitate the return of individuals after they prevail in federal and administrative courts. Such failures underscore a fundamental lack of respect for administrative and court orders. If ICE expressly refuses to facilitate return or constructively refuses (e.g., is non-responsive), litigation options may be considered.

Any ICE refusal to return someone who has prevailed on a petition for review arguably constitutes a refusal to comply with the circuit court's order granting the petition for review. In cases where the court's order restores LPR status, ICE's refusal to facilitate return also violates its own policy directive. Likewise, ICE's refusal to return someone who prevails on an administrative motion constitutes a refusal to comply with an IJ or BIA order granting reopening or reconsideration.

There is no meaningful distinction between prevailing on a petition for review and prevailing on a motion to reopen or reconsider. The statutory right to judicial review, 8 U.S.C. § 1252(a), would be meaningless if a petitioner could not benefit from a favorable Article III Court decision. Similarly, the statutory rights to reconsideration and reopening, 8 U.S.C. §§ 1229a(c)(6)&(7),[28] and regulatory rights to reopening sua sponte, 8 C.F.R. §§ 1003.23 and 1003.2(a), would be meaningless if a noncitizen could not benefit from a favorable immigration court or BIA decision. Moreover, the effect on the removal order is the same regardless whether

---

[28] In *Dada v. Mukasey*, the Supreme Court held that "[t]he purpose of a motion to reopen is to ensure a proper and lawful disposition." 554 U.S. 1, 18 (2008). Further, the Court admonished any interpretation that would "nullify a procedure so intrinsic a part of the legislative scheme." *Dada*, 554 U.S. at 18-19. *See also Kucana v. Holder*, 130 S. Ct. 827, 834, 838-39 (2010) (protecting judicial review of motions to reopen in light of the importance of such motions).

Of relevance here, despite the agency's attempts to bar post-departure motions, *see* 8 C.F.R. §§ 1003.2(d) and 1003.23(b)(1), ten circuits have rejected the validity of this regulatory bar with respect to motions filed pursuant to 8 U.S.C. §§ 1229a(c)(6), (7). *See Perez Santana v. Holder*, 731 F.3d 50 (1st Cir. 2013); *Luna v. Holder*, 637 F.3d 85 (2d Cir. 2011); *Prestol Espinal v. AG of the United States*, 653 F.3d 213 (3d Cir. 2011); *William v. Gonzales*, 499 F.3d 329 (4th Cir. 2007); *Lari v. Holder*, 697 F.3d 273 (5th Cir. 2012); *Pruidze v. Holder*, 632 F.3d 234 (6th Cir. 2011); *Marin-Rodriguez v. Holder*, 612 F.3d 591 (7th Cir. 2010); *Reyes-Torres v. Holder*, 645 F.3d 1073 (9th Cir. 2011); *Contreras-Bocanegra v. Holder*, 678 F.3d 811 (10th Cir. 2012) (en banc); *Jian Le Lin v. United States AG*, 681 F.3d 1236 (11th Cir. 2012).

a circuit court grants a PFR or the immigration court or BIA grants reopening: the final removal order is vacated and the person is restored to pre-removal status.[29]

Given the difficulties with facilitating return to the U.S., in petition for review cases, consider asking the court of appeals to order return as part of its order granting a petition for review. In *Orabi v. Holder*, 738 F.3d 535 (3d Cir. 2014), the Third Circuit reversed a BIA decision with instructions that the government "be directed to return Orabi to the United States in accordance with the ICE regulations cited." Although the court's reference to "regulations" was, in fact, a reference to ICE's return directive, the court's inclusion of return instructions in its merits decision can be cited in support of the argument that the court should order return.

## 2. Create a Paper Trail

As stated throughout this advisory, even if merely contemplating filing litigation to compel return, we strongly advise keeping detailed notes of all conversations and written correspondence related to return. If the only evidence of ICE's refusal to return the client is oral, such notes may form the basis of a sworn declaration from a person with personal knowledge, attesting to the conversation.[30] While attorneys generally should avoid becoming witnesses for their clients, alternative evidence of ICE's refusal to facilitate return may not be available.

## B. Where and What to File

In most cases, a complaint in the district court having jurisdiction over the ICE office responsible for facilitating return is the most appropriate action. Motions and mandamus actions in the courts of appeals also may provide opportunities for redress in some cases.

## 1. Complaint for Declaratory and Injunctive Relief (District Court)

---

[29] When the BIA reopens a case, the removal order is vacated. *Nken*, 556 U.S. at 430 n.1. *See also Contreras-Bocanegra*, 678 F.3d at 818-19. Furthermore, the removal proceedings are reinstated. *Bronisz v. Ashcroft*, 378 F.3d 632, 637 (7th Cir. 2004) (holding that "the grant of a motion to reopen vacates the previous order of deportation or removal and reinstates the previously terminated immigration proceedings"). Thus, the person is restored to pre-removal status. *See Nken*, 556 U.S. at 435 (stating that persons who prevail on a petition for review "can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal"); Directive, at 1 ("ICE will regard the returned alien as having reverted to the immigration status she or he held, if any, prior to the entry of the removal order . . ."). *See also Matter of Lok*, 18 I&N Dec. 101, 105-06 (BIA 1981) *aff'd*, 681 F.2d 107 (2d Cir. 1982).

[30] Declarations attesting to return efforts or ICE's position should be scrupulously accurate. The tone of such declarations should be detached and written to provide the court with information supporting the facts on which the motion is based. Declarations should not overstate the facts or give personal opinions about actions of government actors or opposing counsel. An unprofessional declaration could undermine the motion.

District courts regularly decide declaratory judgment and injunctive relief actions and, therefore, are arguably the most suitable forum for filing an action to compel return.[31]

A district court action can name several defendants, in their official capacities, including, but not limited to, the Secretary of DHS, the Director of ICE, the Field Office Director of the local ICE office, and the Chief Counsel of the local ICE office.

A district court complaint may allege jurisdiction to review ICE's refusal to facilitate return under 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 701 et seq. (Administrative Procedure Act);[32] 28 U.S.C. §§ 2201 and 2202 (declaratory relief); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act).

The federal venue statute, 28 U.S.C. § 1391, governs where the complaint may be filed. Generally, venue will lie in the district where ICE "resides," *see* 28 U.S.C. § 1391(b)(1), and/or where a substantial part of the events giving rise to ICE's refusal to facilitate return occurred, *see* 28 U.S.C. § 1391(b)(2).

There are at least three types of claims one can raise in a district court action to compel return.

### a. *Administrative Procedure Act Claims*

First, ICE's refusal to return the person arguably violates the APA. As an initial matter, it satisfies the APA's judicial review requirement that there be a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Under the APA, a person may ask the court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). A person may also challenge ICE's refusal to return her or him as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," and "in excess of statutory . . . authority, or limitations or short of statutory right," 5 U.S.C. § 706(2)(A)-(C). Further, to the extent ICE defies subpoenas or procedures required by the immigration court, a person may challenge ICE as acting "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

### b. *Constitutional and Statutory Due Process Claims*

Second, ICE's refusal to facilitate return arguably violates the Fifth Amendment's Due Process Clause and a person's statutory rights in removal proceedings, including his right to be present at his own removal proceeding under 8 U.S.C. § 1229a(b)(2). *See also* 8 U.S.C. § 1229a(b)(4)(B) ("the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's behalf, and to cross-examine witnesses presented by the Government . . ."). An individual outside of the United States is substantially hindered in his

---

[31] For sample district court complaints, please contact Trina Realmuto at trina@nipnlg.org.

[32] The APA does not independently grant subject matter jurisdiction, *see Califano v. Sanders*, 430 U.S. 99 (1977), but final agency action is available through federal question jurisdiction. The APA does waive sovereign immunity in actions against the government for injunctive relief, which is necessary for the court to exercise its jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471 (1994). Thus, the APA can be listed in the jurisdictional section of a complaint.

ability to testify, present witnesses and evidence, consult with his attorneys, and cross-examine the government's witnesses and examine its evidence.

Third, as discussed above, ICE's refusal to facilitate return also arguably violates the statutory right to judicial review, 8 U.S.C. § 1252(a), which is effectively rendered meaningless when a petitioner cannot benefit from a favorable court of appeals decision. Congress intended petitions for review of agency decisions to function as an "adequate and effective substitute for habeas corpus review."[33] Accordingly, like a district court judge sitting in habeas, a court of appeals panel must have authority to order effective relief, i.e., ensure that the petitioner is returned.[34] Any other conclusion would raise serious Suspension Clause problems, U.S. Const. Art. I, § 9, cl. 2. Similarly, ICE's refusal to return also may violate the individual's statutory rights to reconsideration or reopening, 8 U.S.C. §§ 1229a(c)(6)&(7), or regulatory right to reopening sua sponte, 8 C.F.R. §§ 1003.23 and 1003.2(a). It also may violate the individual's statutory and regulatory rights to seek the relief at issue in his or her removal proceedings. These statutory and regulatory rights also are effectively nullified if the individual cannot return to pursue either relief from removal or the benefits of reopening or reconsideration.

###    c.    *Mandamus*

Finally, the complaint might include a claim that ICE's refusal to facilitate return warrants injunctive relief in the form of a writ of mandamus compelling ICE to perform its ministerial duty of returning the person. In order for a court to grant mandamus relief, the person must show that: (a) she or he has a clear right to the relief requested; (b) the defendant has a clear duty to perform the act in question; and (c) no other adequate remedy is available. *See, e.g., Iddir v. INS*, 301 F.3d 492, 499 (7th Cir. 2002).

At the end of the complaint, we suggest asking the district court to: (a) accept jurisdiction over the action; (b) declare that defendants' refusal to facilitate the plaintiff's return to the United States violates the Immigration and Nationality Act, the Fifth Amendment's Due Process Clause, and the Administrative Procedure Act; (c) order defendants to immediately facilitate plaintiff's prompt return to the United States – either pursuant to Federal Rule of Civil Procedure 65, pursuant to a writ of mandamus or pursuant to the court's inherent powers under 28 U.S.C. § 1651 and Article III; (d) grant attorneys' fees and costs under 28 U.S.C. § 2412, 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and any other relevant authority; and (e) grant such other and further relief as the court deems just and proper under the circumstances.

---

[33]    *See Luna v. Holder*, 637 F.3d 85, 94 (2d Cir. 2011) ("In response to the Supreme Court's decision in *St. Cyr,* Congress passed the REAL ID Act, again channeling review of removal orders into the courts of appeals. With this Act, Congress intended to provide a scheme of judicial review which is an adequate and effective substitute for habeas corpus.") (internal quotation marks and citations omitted).

[34]    *See Boumediene v. Bush*, 553 U.S. 723, 787 (2008) ("We do hold that when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief.").

### 2. Motions Requesting Return (Circuit Court)

In cases where the court of appeals exercised its jurisdiction over the case, for example, in a petition for review or district court appeal, the circuit court should continue to have jurisdiction to entertain motions related to the main case, e.g., a motion asking the court to order the person's return. *See* Fed. R. App. Proc. 27(a)(1) ("An application for an order or other relief is made by motion unless otherwise provided by these rules"). There is no particular name for such a motion, but some ideas include: motion to enforce court's order, motion to order respondent to cause petitioner's return to the United States, and motion for ancillary relief to enforce court's order.[35] In extreme situations, some attorneys also have filed contempt motions for refusal to comply with the court's order.

### 3. Mandamus (Circuit Court)

Mandamus is appropriate to maintain the integrity of an earlier court decision.[36] If ICE flouts a circuit court decision by refusing to return a petitioner to the United States for execution of that decision, the circuit court arguably has the authority and the duty to preserve the effectiveness of its earlier decision by exercising mandamus jurisdiction.

The Ninth Circuit decision in *Ramon-Sepulveda v. Immigration & Naturalization Service*, 824 F.2d 749 (9th Cir. 1987), is an example of a successful circuit court mandamus action. In that case, the Ninth Circuit issued a writ of mandamus to preserve the effect of its prior decision to grant a petition for review. In its earlier decision, the court held that an IJ cannot reopen deportation proceedings where the evidence (in that case, a birth certificate) was not "newly discovered." *Id.* at 750. Following that decision, the former Immigration and Naturalization Service (INS) initiated new deportation proceedings based solely on the *same* birth certificate. *Id.* Petitioner then filed a mandamus action directly with the court of appeals, arguing that INS' initiation of new proceedings violated the court's earlier decision. The court agreed and issued a writ of mandamus, stating "[i]t is our mandate that the INS flouts. We have the authority and the duty to preserve the effectiveness of our earlier judgment." *Id.* at 751.

## VI. Suggested Strategies for Avoiding *In Absentia* Orders in Removal Proceedings for Respondents Stranded Abroad

Practitioners may face an upcoming immigration court hearing for a client whom ICE has refused to return. In these situations, practitioners may consider the following strategies to avoid an *in absentia* removal order under 8 U.S.C. § 1229a(b)(5) while continuing to pursue administrative and federal court options to secure the client's return.

---

[35]     In *Orabi v. Holder*, 738 F.3d 535 (3d Cir. 2014), the Third Circuit granted a petition for review and ordered the government to return petitioner. Thus, *Orabi* provides some authority for a court's ability to order return.

[36]     *See*, *e.g.*, *Iowa Utils. Bd. v. FCC*, 135 F.3d 535, 541 (8th Cir. 1998), *vacated on other grounds*, 525 U.S. 1133 (1999); *Oswald v. McGarr*, 620 F.2d 1190, 1196 (7th Cir. 1980); *American Trucking Ass'ns, Inc. v. Interstate Commerce Comm'n*, 669 F.2d 957, 961 (5th Cir. 1982); *City of Cleveland v. Federal Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir. 1977); *see also Miguel v. McCarl*, 291 U.S. 442, 451-52 (1934).

- Seek a continuance of the hearing pursuant to 8 C.F.R. § 1003.29. An IJ must assess whether a respondent demonstrates "good cause" for requesting a continuance. Where ICE has refused to return the client, arguably good cause is shown.

- Ask the IJ for a subpoena. *See* 8 U.S.C. § 1229a(b)(1), 8 C.F.R. § 1003.35. Immigration judges have the authority to issue subpoenas for the "attendance of witnesses and presentation of evidence." 8 U.S.C. § 1229a(b)(1). Thus, the IJ may issue a subpoena for DHS to produce a respondent to be a witness and to present evidence at his or her hearing.

- Obtain the client's consent to proceed in her or his absence pursuant to 8 U.S.C. § 1229a(b)(2)(A)(iii). In limited situations, the client's presence may not be necessary for a master calendar hearing to take place if, for example, the judge is simply setting the date for an application to be filed and/or setting a hearing date.

- Move for administrative closure pursuant to *Matter of Avetisyan*, 25 I&N Dec. 688 (BIA 2012). In *Matter of Avetisyan*, the BIA held that IJs may administratively close removal proceedings, even if one of the parties objects. Administrative closure may not be a suitable option as ICE may be even less inclined to return respondents whose cases have been administratively closed. Moreover, if simultaneously pursuing federal court litigation to compel return, having a forthcoming hearing date by which the person must return is strategically helpful.

- Build the record! If the IJ seems inclined to issue a ruling that is not in the respondent's best interest (e.g., *in absentia* order or administrative closure) because ICE refuses to bring the client back, it is imperative that counsel object to the IJ's ruling to preserve any and all appeal issues on the record. As noted above, ICE's refusal to facilitate return arguably also violates the Fifth Amendment's Due Process Clause and a person's statutory rights in removal proceedings, including the right to be present at one's own removal proceeding under 8 U.S.C. § 1229a(b)(2). *See also* 8 U.S.C. § 1229a(b)(4)(B) ("the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's behalf, and to cross-examine witnesses presented by the Government . . ."). An individual outside of the United States is substantially hindered in his ability to testify, present witnesses and evidence, consult with his attorneys, and cross-examine the government's witnesses and examine its evidence.

## VII.   <u>Conclusion</u>

ICE's current return "policy"—a product of the embarrassing revelation that, contrary to the OSG's representations to the Supreme Court, the government lacked a "policy and practice" of providing "effective relief" to individuals who prevail in their cases—fails on several counts. The return policy is incomplete and vests unfettered discretion in the party responsible for removal in the first place. The directive does not cover noncitizens who prevail on motions to reopen or reconsider before an IJ or the BIA or petitioners who are non-LPRs (and whose presence ICE does not deem necessary). ICE also refuses to pay for the cost of return for any petitioner, even indigent ones. Finally, ICE refuses to return noncitizens who prevail on PFRs whenever it deems their presence unnecessary.

An incredible lack of coordination within and among the relevant agencies plagues the process. Some practitioners have had to file a complaint in district court seeking to compel return.

Practitioners whose clients are considering seeking return to the United States should contact the ICE Enforcement and Removal Office, to see if the agency will agree to facilitate return and to begin making arrangements. If that process fails to yield return, practitioners should consider litigation options.

***Contact us***

**Practitioners are constantly confronting new and complicated obstacles in seeking the return of their clients. Please contact the National Immigration Project at trina@nipnlg.org or the American Immigration Council at clearinghouse@immcouncil.org if you would like help strategizing around these situations.**

**<u>Sample Email to ICE ERO</u>**

To: ERO.INFO@ice.dhs.gov

To Whom It May Concern:

My firm represents an individual ([NAME], A#_____) who is currently in [CITY, COUNTRY]. [If applicable: [NAME] has a hearing before the [LOCATION] Immigration Court on [DATE]]. I write to seek your assistance in returning [NAME] to the United States [in advance of that hearing / in an expeditious manner].

On [DATE], [NAME] was removed based on [DESCRIBE BASIS FOR ORDER OF REMOVAL]. Subsequently, [DESCRIBE NATURE OF PROCEEDINGS SINCE THEN]. On [DATE], [COURT/BIA/IJ] granted [NAME]'s [motion for reopening/rehearing or Petition for Review]. A copy of the decision is attached to this email.

[For cases involving returning LPRs who prevail on PFRs, consider adding: As your agency acknowledged in its Feb. 24, 2012 directive, when a PFR is granted, the "alien will once again, in contemplation of law, be an LPR even though removal proceedings may still be pending before EOIR on remand." *See also Matter of Lok*, 18 I&N Dec. 101, 106 (BIA 1981).]

      OR

[For cases involving returning LPRs who prevail on motions to reopen, consider adding:  When a case is reopened, the removal order is vacated. *Nken v. Holder*, 556 U.S. 418 (2009). Reopening restores the person to her/his status prior to the removal order, i.e., lawful permanent resident. *See Matter of Lok*, 18 I&N Dec. 101, 106 (BIA 1981) (holding that LPR status terminates when there is a final order, but that "reversal on the merits of that deportability finding by an appellate court or administratively upon a motion for reopening or reconsideration" can restore lawful permanent resident status").]

Accordingly, [NAME] must be [if applicable: restored to her/his pre-removal status] and allowed to pursue [RELIEF].  I respectfully request your assistance in facilitating her/his return to the United States so that s/he may be restored to this status.

[If applicable: Furthermore, I note that the [Court/BIA/IJ] specifically ordered that [NAME] be permitted to enter the United States for her/his calendar hearing on [DATE]. Therefore, if [NAME] is not permitted to enter the United States for this purpose, your agency will have failed to comply with the [Judge's/IJ's] order. Although I hope this does not occur, such a failure will force my office to consider other actions, including whether to file an action in federal court seeking to compel compliance with the order.]

I am also supplying the follow information to assist with return arrangements:  [If applicable: federal court case #]; passport # and expiration date; the address and telephone # at the place where [NAME] intends to live upon return; the closest U.S. consulate to obtain necessary paperwork; and anticipated port of entry.

I appreciate your prompt assistance with this matter.

Sincerely,

 [Attorney Name]

## <u>Web Addresses for Documents Referenced in this Advisory</u>

- ICE Policy Directive Number 11061.1 (Feb. 24, 2012), http://www.ice.gov/doclib/foia/ dro_policy_memos/11061.1_current_policy_facilitating_return.pdf.

- U.S. ICE, Frequently Asked Questions about ICE Policy Directive Number 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (2012), *available at* http://www.ice.gov/ero/faq-return-certain-lawfully-removed-aliens.

- U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations Contact Form, https://www.ice.gov/webform/ero-contact-form

- *Victory Denied: After Winning On Appeal, An Inadequate Return Policy Leaves Immigrants Stranded Abroad*, New York University School of Law Immigrant Rights Clinic (July 2014), http://nationalimmigrationproject.org/legalresources/ NIPNLG_v_DHS/2014-7-3%20Victory%20Denied.pdf.

- National Immigration Project of the National Lawyers Guild, et al., *Seeking a Judicial Stay of Removal in the Court Of Appeals: Standard, Implications Of Ice's Return Policy and the OSG's Misrepresentation to the Supreme Court, and Sample Stay Motion* (Jan. 21, 2014), http://nationalimmigrationproject.org/legalresources/practice_advisories/ pa_Seeking_Judicial_Stay_1-21-2014.pdf.

- Letter from Michael R. Dreeben, Deputy Solicitor General, to Hon. William K. Suter, Clerk of the Supreme Court (Apr. 24, 2012), http://nationalimmigrationproject.org/ legalresources/NIPNLG_v_DHS/OSG Letter to Supreme Court, Including Attachments - April 24 2012.pdf

- Letter from Paul R.Q. Wolfson and Adam Raviv to Hon. William K. Suter, Clerk of the Supreme Court (May 4, 2012), http://nationalimmigrationproject.org/legalresources/ NIPNLG_v_DHS/Amici Letter to the Supreme Court in Nken - May 4 2012.pdf.

- CBP Directive No. 3340-043, at 5 (The Exercise of Discretionary Authority) (Sept. 3, 2008), http://nationalimmigrationproject.org/legalresources/NIPNLG_v_DHS/CBP%20 Parole%20Directive%20%28Partially%20Redacted%29%20-%20Sept%203% 202008.pdf.

Case documents, case updates, and the documents the government disclosed through the FOIA litigation and to the Supreme Court in *Nken* are available on the NIPNLG website at http://nationalimmigrationproject.org/legalresources.htm#nipnlg.

# EXHIBIT B

# VICTORY DENIED

After Winning On Appeal, An Inadequate Return Policy
Leaves Immigrants Stranded Abroad

July 2014

New York University School of Law
Immigrant Rights Clinic

**ACKNOWLEDGEMENTS**:

The primary authors of this report are Tianyin Luo and Sean Lai McMahon, under the supervision of Professor Nancy Morawetz. The views expressed in this report are the views of the authors and do not necessarily reflect the views of New York University School of Law.

This report is made possible by the contributions of immigrants who have struggled to return to the U.S. and who have been bravely willing to share their stories, and by the contributions of attorneys who have made the effort to document these issues and discuss them with us. Thank you sincerely for all of your help.

This report also presents new material obtained through Freedom of Information Act litigation in the Southern District New York: *National Immigration Project of National Lawyers Guild, et al.* v. *Department of Homeland Security, et al*, 11 Civ. 03235. The FOIA parties in this litigation are the National Immigration Project of the National Lawyers Guild, the Post-Deportation Human Rights Project at Boston College, the Immigrant Defense Project, the American Civil Liberties Union and Professor Rachel Rosenbloom. The FOIA parties are represented by the Immigrant Rights Clinic at NYU School of Law.

The authors of this report would also like to thank Jessica Chicco, supervising attorney with the Post-Deportation Human Rights Project at Boston College, and Trina Realmuto, staff attorney with the National Immigration Project of the National Lawyers Guild, whose guidance, input and commitment on this project has been invaluable.

**Victory Denied: After Winning On Appeal, An Inadequate Return Policy Leaves Immigrants Stranded Abroad**

© Copyright 2014 by the Immigrant Rights Clinic
All rights reserved. Published July 2014.

# Table of Contents

Executive Summary ............................................................................................................... ii

Introduction ........................................................................................................................... 1

I. The *Nken* Misrepresentation, the Government's 2012 Apology, and the Government's Ongoing Efforts to Shield its Actual Policies From Judicial Review ........................................... 3

  A. The *Nken* Misrepresentation ..................................................................................... 3

  B. The Government's Apology and New Agency Directive ...................................................... 4

  C. The Government's Ongoing Efforts to Shield its Actual Policies from Judicial Review ..... 6

  D. New FOIA Documents and the Ongoing Refusal to Disclose to Courts the Predicament of Prevailing Petitioners Who Are Not Returned ................................................................... 8

II. The Government's 2012 Apology Letter And 2012 ICE Directive Continue Many Of The Failings Of The Old Policy ......................................................................................... 12

  1. Asylum-seekers, Victims of Serious Crimes and Victims Of Human Trafficking Have Limited Access To The Policy .......................................................................................... 13

  2. The ICE Directive Closes Off Relief For Some Immigrants Due To The Immigration Courts' Frequent Refusal to Hear Cases Involving Persons who are Abroad .................. 15

  B. Even When Petitioners Are Eligible to Return Under the ICE Policy, the Obstacles They Face Are Enormous ....................................................................................................... 19

  1. Indigent Petitioners Cannot Return Under The ICE Directive .......................................... 20

  2. Other Agencies Do Not Follow ICE's Directive, And Immigrants Bear The Cost Of Inter-Agency Disunity ..................................................................................................... 20

  3. ICE Decentralization Makes Coordinating Action Difficult, And ICE Discretion Makes Return Uncertain For Noncitizens .................................................................................. 25

III. In Light Of The Government's Ongoing Unwillingness To Provide a Comprehensive and Workable Return Policy, Courts Must Clarify That Removal Constitutes Irreparable Harm ...... 28

Conclusion ............................................................................................................................ 30

## Executive Summary

Today, many immigrants who have won their deportation cases on appeal before a circuit court—a filing called a "petition for review"—are stranded in their countries of origin, with no way to return to the U.S. This problem is caused by the government's insistence on deporting immigrants who have a legal right to remain in the United States before they have a chance to prove that right in court. Many immigrants try to stop these premature deportations by asking the courts to issue a stay of removal. The government opposes many of these stays, on the theory that if the immigrant wins her appeal while she is outside the country, she can then return to the U.S. As this report demonstrates, this theory is inoperative in practice. Immigrants who win their cases on appeal while abroad are often effectively denied the benefit of their legal victory, as they are ineligible to be returned under the government's existing "return policy," or face immense practical obstacles to returning that prevent them from doing so.

This report illustrates how the government's inadequate return policy, and its persistent unwillingness to repair this policy, negatively affects individual immigrants' cases and the entire process of judicial review. It also presents newly acquired government documents that show that the government is well aware of deficiencies in the policy, even as it continues to assure courts that the return policy make stays of removal unnecessary. The introduction of the report provides a brief overview of the issue and explains how the inability to return after winning a case on appeal is detrimental to immigrants. Part I describes the history of the problem, stemming from the Supreme Court case *Nken v. Holder*, 556 U.S. 418, in 2009, through 2014. It explains how the pattern of obfuscation by Executive Branch agencies, in which entities from the Office of the Solicitor General to the Office of Immigration Litigation have misrepresented, dodged, and willfully ignored the scope of the problem, demonstrates how immigrants have never had a meaningful opportunity to return after winning their case on appeal. Though in *Nken*,

the Supreme Court based its decision in part on the assumption that deported immigrants can return to the U.S. after winning their case in court, the report highlights how this assumption was built on a misrepresentation by the Solicitor General in 2009, and how lower courts, attorneys, and immigrants continue to rely on the assumption. The report further explores how courts have never had the opportunity to meaningfully review this policy and this false assumption, as in the years since *Nken*, efforts by the government to repair its own error have been perfunctory. It shows this with evidence from a recent FOIA case against the Department of Justice, which indicates that as late 2013, the Department of Justice knew that immigrants were struggling to return to the U.S. after winning their appeals cases, and that those unable to return may be unable to continue their cases before an immigration judge, yet still sought to suppress the presentation of the issue before a circuit court of appeals.  Meanwhile, the government continues to assure circuit courts that its return procedures are sufficient to prevent irreparable harm to those deported before they win their cases.

Part II illustrates the continuing inadequacies of the return policy with the stories of immigrants who have faced enormous obstacles trying to return to the U.S., despite having won their cases on appeal. It explores how the guiding documents of the return policy – one agency policy directive and a letter from the Office of the Solicitor General – fail to adequately include many immigrants who have meritorious claims for staying in the United States, including asylum-seekers, victims of serious crimes and victims of human trafficking. The report explains how the policy places these immigrants in a double-bind, as they not only are unable to return to the United States to press their claims, they are unable to fight their case from abroad because of jurisdictional problems. The report further highlights how even for those immigrants who are entitled to return to the United States by the terms of the existing policy, the practical and

bureaucratic obstacles are so enormous that they can effectively foreclose these immigrants from returning.  Indigent immigrants are left out in the cold since they lack the funds to arrange travel back from the places to which they were deported.

Part III provides a recommendation to circuit courts. The report asks courts to presume that removal from the United States before an immigrant's appeal is complete is an "irreparable injury" to her case, such that she should be allowed to stay in the U.S. until her case is finished. The report describes the necessity of this approach for protecting judicial review, given the great difficulty immigrants face getting the benefit of their victory in court once they have already been deported.

**Introduction**

Today, many immigrants who have won their deportation cases on appeal before a circuit court—a filing called a "petition for review"—are stranded in their countries of origin, with no way to return to the U.S. This problem persists despite repeated government assurances that a consistently effective return policy exists to bring such individuals back to the United States after they win their petitions for review. These immigrants face a lose-lose situation. The Government obstructs their return through its inadequate return practices and policy, and courts mistakenly deny stays of removal based on judicial language that presumes an unobstructed path to return for those who prevail—language that is on the books solely as a result of the Government's own misrepresentations to the Supreme Court in *Nken v. Holder*.[1] This report presents newly obtained documents from Freedom of Information Act litigation against the Department of Justice[2] to detail the inadequacies of the government's current return policy. These documents include evidence that Justice Department lawyers at the highest level are aware of the ongoing problems with the return policy and the extraordinary difficulty that noncitizens face in pursuing their claims when they are not returned. In addition, this report details the stories of persons who have faced extraordinary obstacles in attempting to return to the U.S., despite the lengthy and vigorous advocacy of their lawyers. The gaps in the return policy demonstrate that in order to ensure individuals get the full benefit of judicial review, courts must treat removal of a petitioner during ongoing litigation as presumptively irreparable harm when adjudicating a stay of removal.

Removal during appeal litigation is an immense harm to immigrants in a number of ways. When removed, a noncitizen who has been living in the United States for years is forced to leave

---

[1] 556 U.S. 418 (2009).

[2] *National Immigration Project of National Lawyers Guild, et al*. v. *Department of Homeland Security, et al*, 11 Civ. 03235 (S.D.N.Y.) (order dated Feb. 24, 2014) (requiring production of documents by April 18, 2014).

behind her family, friends, work, and all other ties to this country for the time—often *years*—that it takes for a petition for review to be litigated.

This report focuses on one aspect of the harm that deportees face—the effective deprivation of the benefits of judicial review when a noncitizen is removed prior to the adjudication of a petition for review. Many petitioners who win at the circuit court level are barred from returning to the U.S. by gaps in the return policy or by practical obstacles. First, the Government refuses to assure the return of the indigent and non-lawful permanent residents, such that many noncitizens that prevail on their petitions for review may never have the chance to return at all. Second, for lawful permanent residents (LPRs) the government does not assure return, and even those who can afford to pay their own way face significant practical obstacles to return, including inconsistent priorities and policies between government agencies, lack of information about initiating the return process, and lack of coordination within Immigration and Customs Enforcement (ICE). Lastly, immigration courts on remand will often refuse to hear cases for those who are not returned.

Although government lawyers are fully aware of the obstacles to return, and the misrepresentations that were at the heart of the Supreme Court's statements in *Nken*, they have persisted in implementing a strategy designed to keep the circuit courts from even considering the limitations of the return policy and the implications of those limitations for the issuance of stays of removal. As a result, courts should step in and assure that decisions about stays of removal are based on the actual harm that noncitizens face if they are removed, by presuming that removal is an irreparable harm until the Government can assure that all successful petitioners will be returned.

## I. The *Nken* Misrepresentation, the Government's 2012 Apology, and the Government's Ongoing Efforts to Shield its Actual Policies From Judicial Review

### A. The *Nken* Misrepresentation

The courts of appeals play a crucial role in reviewing the legality of removal orders. Before the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, a noncitizen petitioner automatically received a stay of removal—permission to remain in the U.S. temporarily—so that she could pursue her right to judicial review.[3] IIRIRA, however, eliminated such automatic stays while at the same time granting courts jurisdiction to hear appeals from petitioner's abroad.[4] In light of this change, the circuits split over what test to apply in deciding stays of removal for petitioners pending judicial review.[5]

In the 2009 case *Nken v. Holder*, 556 U.S. 418 (2009), the U.S. Supreme Court sought to settle this split. In doing so, it established a four-factor test for circuit courts to apply when deciding whether to grant noncitizen petitioners a stay of removal. The four factors are: (1) whether the noncitizen petitioner has made a strong showing that he is likely to succeed on the merits; (2) whether the petitioner will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties; and (4) where the public interest lies.[6]

The Supreme Court singled out the first two factors—likelihood of success on the merits and irreparable harm—as the most critical.[7] The Court further stated that for a petitioner to

---

[3] *See* 8 U.S.C. § 1105a(a)(3) (1994 ed.) ("The service of the petition for review . . . shall stay the deportation of the alien pending determination of the petition by the court, unless the court otherwise directs."); *see also Nken v. Holder*, 556 U.S. 418, 424 (2009) for an extended discussion and analysis.

[4] *See* IIRIRA § 306(b), 110 Stat. 3009-612 (repealing § 1105a and lifting the ban on adjudicating petitions for review once a noncitizen was abroad); 8 U.S.C. § 1252(b)(3)(B) (2006 ed.) (stating that filing a petition for review no longer automatically stays removal).

[5] *Nken v. Holder*, 556 U.S. 418, 423 (2009).

[6] *Id.* at 425-26.

[7] *Id.* at 434.

establish that she would be irreparably harmed if removed from the U.S., individualized harm had to be shown. The fact of a person being removed from the U.S., despite all the hardships that it naturally entails, could not categorically constitute irreparable harm.[8] In effect, this meant that a noncitizen who was likely to win her removal proceedings and ultimately be able to stay in the U.S., would be deported prematurely and have to spend years fighting her case abroad. In fact, a recent empirical study of 1,646 petition for review cases found that courts denied stays in about half of the appeals that were ultimately granted, meaning that many immigrants with meritorious claims were needlessly removed from the U.S.[9]

### B. The Government's Apology and New Agency Directive

The Supreme Court's irreparable harm analysis in *Nken* was based on a false understanding: that there was an effective and consistent return policy in place for a petitioner who prevailed on her petition for review while abroad, such that she could return to the U.S. after winning. It was the promise that a petitioner could come back that made removal *not* an irreparable harm in the view of the Court.[10] In reaching this conclusion, the Supreme Court relied on a misrepresentation by the Solicitor General that "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail *can be afforded effective relief by*

---

[8] *Id.* at 435.

[9] Fatma Marouf, Michael Kagan, Rebecca Gill, *Justice On The Fly: The Danger Of Errant Deportations*, 75 OHIO ST. L.J. (forthcoming 2014), *available at* http://scholars.law.unlv.edu/cgi/viewcontent.cgi?article=1912&context=facpub.

[10] "The automatic stay prior to IIRIRA reflected a recognition of the irreparable nature of harm from removal before decision on a petition for review, given that the petition abated upon removal. Congress's decision in IIRIRA to allow continued prosecution of a petition after removal eliminated the reason for categorical stays, as reflected in the repeal of the automatic stay in subsection (b)(3)(B). It is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury." *Id.* at 435.

*facilitation of their return, along with restoration of the immigration status they had upon removal.*"[11]

In fact, there was no consistently effective return policy that adequately assured the facilitation of all petitioners' returns after winning their appeal. Advocates knew from experience that the Solicitor General's statement could not be true, as there were many stories of clients who would win their appeals from abroad, yet found themselves stranded in another country with no recourse to return to the United States. After District Court Judge Jed Rakoff ordered the Department of Justice to reveal the email communications that underlay the representations made to the Supreme Court,[12] ICE issued "Policy Directive 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens."[13] This non-binding internal directive sets out policy guidelines for one agency—ICE—on when and how to return prevailing petitioners to the U.S. The directive was followed in April 2012 by a letter from the Solicitor General to the Supreme Court admitting that there was no effective return policy at the time of *Nken*, but

---

[11] *Id.* at 435, emphasis added (*quoting* Brief of the Solicitor General at 44). *See also* Nancy Morawetz, *Convenient Facts:* Nken v. Holder*, The Solicitor General, And The Presentation Of Internal Government Facts*, 88 N.Y.U. L. Rev. 1600 (2014) (explaining how the Solicitor General's Office was aware of significant gaps in the return policy before briefing and argument in *Nken*).

[12] Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Security, 868 F. Supp. 2d 720, 730 (S.D.N.Y. 2012).

[13] Directive 11061.1 is available at http://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf. The authors of this report—Boston College's Post-Deportation Human Rights Project, the National Immigration Project of the National Lawyers' Guild, and New York University's Immigrant Rights Clinic—were involved in the FOIA litigation that ultimately forced the government's hand. *National Immigration Project of the National Lawyers' Guild et al. v. Department of Homeland Security*, No. 11 Civ 3235(JSR) (S.D.N.Y.).

claiming that the problem was effectively solved by the new ICE directive.[14] On its face, this directive makes the decision whether to return noncitizens who have prevailed in the circuit courts into a discretionary choice for the agency, offering the greatest discretion in the case of persons like *Nken*, who are seeking relief such as asylum and are not lawful permanent residents. After receiving the Solicitor General's apology, the Court did not revisit the language of the opinion, however, perhaps relying on the promise of the Solicitor General that the Department of Justice's Office of Immigration Litigation (OIL) would present the ICE Directive to courts for review whenever it opposed motions for stays of removal.

### C. The Government's Ongoing Efforts to Shield its Actual Policies from Judicial Review

From the start, the Solicitor General's suggestion that a misrepresentation could be cured by the government's promise to fully inform the circuit courts of its apology and new directive was a problematic plan for curing the misrepresentation in *Nken*. Even assuming OIL had consistently presented the ICE Directive to courts as required by the Solicitor General's letter, this would have been an inadequate solution for ensuring that courts, petitioners and advocates were fully informed about the misrepresentation in *Nken* and the flaws of the Government's return policy. Unlike a court opinion, OIL motions cannot be discovered by petitioners because immigration cases can only be obtained at the specific court house and are not easily available.When deciding whether to apply for a stay, petitioners will take the erroneous language in *Nken* at face value; there is no indication that this language is wrong through ordinary methods of legal research. As a result, many petitioners may prematurely give up the fight to obtain a stay

---

[14] Michael R. Dreeben, Deputy Solicitor General, Letter to William Suter, Clerk at 5 (Apr. 24, 2012) ("The government does not believe that any action by this Court is required.") (hereinafter "SG Ltr.").

of removal. This undermines a basic premise of the rule of law, that the language of the law should be clear enough to provide sufficient notice to individuals who are impacted by it.

In practice, OIL failed to provide courts the opportunity to review the return policy, by not consistently informing courts of the SG's Letter and the ICE Directive or proving courts with its own knowledge about the Directive's limitations. This effectively shielded the courts from reviewing the return policy and rectifying its inadequacies. In oppositions to motions to stay throughout 2012 and 2013, the government continued to cite the mistaken language in *Nken*, leaving under-informed courts and petitioners to operate as if this language was completely valid. Well into 2013, courts continued to deny motions for stay of removal based on the false premise of *Nken*'s irreparable harm language.

In late 2013, OIL filed supplementary letters in cases in which they had opposed a stay of removal, explaining that OIL was no longer relying on the erroneous *Nken* language but rather relying on the 2012 ICE Directive. However, these letters were often too little, too late—many were filed after a stay had already been denied based on OIL's original, erroneous opposition briefs, and some were filed after noncitizens already had been removed. They also continued to cite to the Directive as though it would provide an adequate solution for all immigrants who win their petitions for review, despite their knowledge that the Directive could leave prevailing immigrants stranded abroad.[15]

---

[15] This spate of letters did not indicate an across the board change in OIL briefing policy to notify courts of the *Nken* problem and the ICE Directive. In early 2014, the authors surveyed recent opposition to motions to stay in the Second and Ninth Circuits. This review found that, rather than rely on the erroneous language in *Nken* or presenting the ICE Directive and SG Letter, OIL was frequently skipping the irreparable injury prong of the stay analysis. That is, opposition to motion to stay briefs frequently avoided analyzing whether an irreparable harm could be suffered at all, focusing instead on the other factors of the stay test. Rather than solving the

## D. New FOIA Documents and the Ongoing Refusal to Disclose to Courts the Predicament of Prevailing Petitioners Who Are Not Returned

In 2014, the same FOIA litigation that led to the 2012 apology letter revealed the Department of Justice's clear knowledge at the highest levels of the ongoing difficulties faced by persons who are deported before they win their cases in the courts of appeals. After losing three times in proceedings before United States District Judge Jed Rakoff,[16] the government produced Department of Justice documents post-dating the 2012 apology. These documents included communications about how to resolve the case of Jo Desire, a lawful permanent resident who was deported in 2006 and who had been unable to return to the United States under the 2012 ICE directive. His case showed both the difficulty of return and the impossibility of litigating a case from abroad. But rather than recognizing that Jo's case showed the inadequacy of the government's return policy, the Department of Justice chose to simply solve Jo's individual case while shielding the courts from the actual problems with the return policy.

Jo Desire came to the U.S. from Haiti as an LPR in 1967 at age 14, served honorably in Vietnam and lived in the U.S. without incident for 30 years.[17] He received a drug conviction in 1998, was picked up by the Immigration and Naturalization Service in 1999, and ultimately was removed on the ground that his conviction was an aggravated felony.[18] He was held in

---

problem, this leads courts to conduct their own analyses—relying on the language in *Nken*—without any indication that *Nken* was based on a misrepresentation.

[16] See Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Security, No. 11-CV-3235, 2012 WL 6809301 (S.D.N.Y. 2012)(ordering Department of Justice to search all OIL emails); Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Security, No. 11-CV-3235, (S.D.N.Y. May 5, 2013)(denying government motion for reconsideration); Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Security, No. 11-CV-3235, (Aug. 20, 2013)(oral order)(requiring search of documents through the date of an adequate search).

[17] App. Opening Br. of Desire v. Holder, No. 11-15199, Dkt. 2, 2 (9th Cir. May 4, 2011).

[18] Id. at 3.

immigration detention from 1999 until 2006.[19]  In 2007, the Ninth Circuit vacated Jo's removal order finding that he had not been convicted of an aggravated felony.[20]  On remand, ICE sought to add new charges. With the help of a pro bono attorney, Jo argued that the issue of his removability was res judicata and that he should not have to fight his removal case again.[21]

When he first won his petition for review, the government informed Jo that if he returned, he would have to arrange his flight and pay for it.[22]  However, Jo lacked the funds to purchase a plane ticket. As such, Jo was stranded in Haiti from 2007 until 2013. Throughout the litigation, the government continued to assert that Jo would have to pay for his own return.[23]  When the case could not proceed due to Jo's inability to return, the case was administratively closed. Meanwhile, Jo's pro bono lawyers filed a habeas case challenging the new proceedings.  When that case was dismissed they appealed to the Ninth Circuit.   After briefing and oral argument, the Ninth Circuit ordered the government to file documents showing what was happening in the immigration court proceeding. The government's response included an email exchange in which Jo's lawyer expressed his client's plight:

> Your Department's insistence that my indigent client pay for his own travel to defend himself effectively denies him his due process right to appear and defend himself at the removal hearing.  Your department removed my client to one of the poorest countries on the planet. He has no means of supporting himself. He is currently having trouble even buying food let alone procuring international travel.[24]

---

[19] Interview with Kathleen Kahn, on file with author.
[20] App. Opening Br., supra note 17, at 3-4.
[21] Kahn, supra note 19
[22] *Id*. Documents related to the Desire case were produced in the *NIP v. DHS* FOIA case and are attached to the Declaration of Nancy Morawetz in Support of Petitioner's Reply and in Further Support of His Application for a Stay of Removal, dated June 19, 2014, Harbin v. Holder, No. 14-1433 (2d Cir.), avail. at
http://www.nationalimmigrationproject.org/legalresources.htm#nipnlg ("Morawetz Dec.")
[23] *Id*.
[24] Morawetz Decl., *supra* n. 22,  Ex. B.

ICE continued to insist that Desire would have to pay for his own travel.

The Ninth Circuit proceeded to issue a second order asking for supplemental briefing on whether Jo could move the immigration court to lift the administrative closure while he was out of the country, whether he would need the government's cooperation, and whether the immigration judge would have EOIR had jurisdiction to conduct reopened proceedings while an Jo was outside the U.S.[25]

The newly disclosed documents show that OIL did not know the answer to whether Jo could litigate his case if he could not afford to return. In other words, it did not even know whether those who fell through the cracks of the return policy had any chance of continuing their cases on remand to an immigration judge. This in itself is an extraordinary fact given that OIL routinely assures circuit courts that being deported does not cause irreparable harm. OIL asked ICE what its position would be on Jo pursuing his case from abroad. The ICE lawyer wrote back that ICE would reserve its right to contest the immigration court's jurisdiction.[26] OIL asked the Executive Office of Immigration Review (EOIR) to consult on this issue.[27] The emails do not provide the response from EOIR, but along the way, someone appears to have recognized the conflict between how EOIR answered this question and the sunny promises being made to the courts. At that stage, the OIL lawyers brought in the lawyers from the Office of the Solicitor General with emails titled: "meeting to discuss Desire and Nken."[28] In particular, OIL

---

[25] FOIA Documents, DOJ-Civil 2141.

[26] FOIA Documents DOJ-Civil 2659.

[27] FOIA Document DOJ-Civil 2129 (communication between OIL and EOIR about conducting videoconference proceedings in Haiti).

[28] FOIA Document DOJ-Civil 2081 (asking for a meeting including OIL, the Office of the Solicitor General and EOIR to "discuss the issues regarding how cases are handled at EOIR in circumstances – like those presented in the Desire case – where an alien is removed while a

understood the conflict between what was happening to Jo and what OIL was telling the courts in the aftermath of *Nken*. One email asked EOIR, "[W]e would like to understand how EOIR's position works with the ICE directive."[29] The email records end soon thereafter due to the date restrictions on the FOIA litigation, but the public record shows what happened. Rather than provide supplemental briefing, the government dropped all charges of removability and agreed to return Jo to the United States. Jo's pro bono lawyer then withdrew her appeal before the Ninth Circuit and the government never had to reveal the limits of EOIR's policies on allowing immigrants who have prevailed to continue to pursue their cases after they have been deported.

After placing the burden of return completely on Jo for 6 years, DHS terminated proceedings against him and transported him to the U.S., for free, on a JPATS (U.S. Marshal Service) plane on October 15, 2013. He was detained for one week in Virginia and then transported to Arizona where he was released with the promise that the government would return him to his previous status as an LPR. The entire process took just over a week, as compared to the years Jo spent languishing in Haiti without the funds to return.[30]

Jo's story illustrates the limited effectiveness of the return policy in assuring meaningful relief through judicial review, even for a person who is a lawful permanent resident and who has the benefit of extraordinary advocacy by pro bono lawyers. In preparation from this report, the authors canvassed other lawyers who are sometimes, like Jo's lawyer, able to obtain relief for their clients eventually through vigorous advocacy. But each of these stories shows the limits of

---

petition for review is pending; the alien prevails on the petition for review; and there are further immigration proceedings on remand?').
[29] *Id.*
[30] Kahn, supra note 19.

the return policies and the degree to which it relies on extraordinary legal advocacy resources to

obtain return for those who prevail in the circuit courts.

## II. The Government's 2012 Apology Letter And 2012 ICE Directive Continue Many Of The Failings Of The Old Policy

### A. The SG Letter and ICE Directive Have Critical Gaps That Restrict The Ability Of Noncitizens To Return To The U.S.

While the Office of the Solicitor General assured the Supreme Court in its 2012 letter that

the government now has return procedures that matched their original assertion in *Nken v.

Holder*, the ICE Directive does not, by its own terms, provide for consistent and effective return

of immigrants.[31] In the key passage of the policy, ICE states:

> Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings. ICE will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order and may detain the alien upon his or her return to the United States. If the presence of an alien who prevails on his or her PFR is not necessary to resolve the administrative proceedings, ICE will not facilitate the alien's return. However, if, following remand by the court to the Executive Office for Immigration Review (EOIR), an alien whose PFR was granted and who was not returned to the United States is granted relief by EOIR or the Department of Homeland Security (DHS) allowing him or her to reside in the United States lawfully, ICE will facilitate the alien's return to the United States.

On its face, the Government's current return policy does not assure the return of people

that are not lawful permanent residents (LPRs), including asylum-seekers, victims of human

trafficking and victims of serious crimes, and potential recipients of withholding of removal or

Convention Against Torture (CAT) relief. Further, as the documents around Jo Desire's case

show, it is difficult—and sometimes impossible—for noncitizens to fight their deportation cases

---

[31] *Id.* at 4.

from abroad because immigration courts refuse to hear their cases while the petitioners are in another country. Because the ICE Directive does not assure that these immigrants can return to the U.S., their inability to fight their case from abroad leaves them in a legal limbo with no options.

### 1. Asylum-seekers, Victims of Serious Crimes and Victims Of Human Trafficking Have Limited Access To The Policy

The ICE Directive limits the return of non-lawful permanent residents who have prevailed in court to situations where ICE deems the person's presence "necessary for continued administrative proceedings."[32] Under this Directive, asylum-seekers, victims of serious crimes and human trafficking who could receive humanitarian visas, and potential recipients of withholding of removal or CAT relief, are not given any assurance that they will be returned to the U.S. after prevailing before a circuit court. Ironically, Jean Marc Nken, the petitioner whose case became the font of the Supreme Court's erroneous language about return procedures, was an asylum-seeker. As such, even he would not be guaranteed return on prevailing under the current ICE policy.

Take Edward's story as an example of the serious challenges a non-LPR faces.[33] Edward is a young man who was removed following a conviction for joyriding (vehicle taking), which is not a removable offense.[34] He had been living without any status in the U.S. since he was a young child. As a domestic violence survivor, Edward had been granted derivative U visa status, along with his sister and mother. Today, his sister and mother are lawful permanent residents.[35] When Edward was convicted, in 2009, the immigration judge erroneously entered an order of

---

[32] Directive 11061.1 ¶ 2.
[33] The petitioner's name has been changed in order to preserve his privacy.
[34] Interview with Andrew Knapp, on file with author.
[35] *Id.*

removal on the basis that Edward had entered without inspection, though his U visa was granted prior to the commencement of removal proceedings. Edward appealed his case to the BIA, but lost and was removed to Mexico.[36]

With the help of a pro bono attorney, Edward filed a petition for review at the Ninth Circuit.[37] In 2013, the Ninth Circuit remanded his case to the BIA. Despite having been granted a new opportunity to fight his case in immigration court, Edward faced difficulty returning to the U.S., because though a U visa holder is in lawful status, he is not considered a "lawful permanent resident" and is not assured return under the Directive. The ICE Directive only allows for someone in Edward's situation to return if ICE, in its sole unfettered discretion, deems his return "necessary for continued administrative proceedings."[38] Edward faced considerable resistance from ICE in his attempt to return. He was eventually allowed to return due to vigorous advocacy by his attorney. *See* Part III.B.2, *infra*.

Yet, it was vital for certain claims for relief that Edward be present in the U.S. For example, Edward could not make an application for an extension of U visa status, since it is only available to "[n]onimmigrants in the United States."[39] This meant that if Edward's U-visa status expired while he was in Mexico, he would permanently lose one avenue of relief, despite his victory at the circuit court. Finally, being stranded in Mexico, a country Edward had not resided in since he was a child, took an economic and emotional toll on him and his family that could easily be remedied by allowing Edward to return to the U.S. to finish his removal proceedings.

---

[36] *Id.*
[37] *Id.*
[38] Directive 11061.1 ¶ 2.
[39] See page 1 of the Instructions for Form I-539 at http://www.uscis.gov/files/form/i-539instr.pdf (emphasis added); 8 U.S.C. § 1184(p)(6).

Edward's is not the only case in which the Government argued that the petitioner could not qualify for relief due to his or her absence from the U.S. In one case in the Ninth Circuit, the Government argued that because the petitioner had already been removed from the U.S., his withholding of removal relief became moot.[40] The Government's argument would essentially foreclose relief for those who might prevail on a withholding claim—a form of humanitarian relief that allows individuals who fear losing their life or freedom to remain in the U.S.

### 2. The ICE Directive Closes Off Relief for Some Immigrants Due to the Immigration Courts' Frequent Refusal to Hear Cases Involving Persons Who are Abroad

In theory, an individual who is not assured return under the ICE Directive could litigate her removal case from abroad. However, in practice this is extraordinarily difficult, because it depends on EOIR being willing and able to conduct hearings for persons who are out of the country. Rather than being willing to go forward in these cases, EOIR has often taken the position that it lacks jurisdiction, or has administratively closed proceedings—an action that places that case on the inactive calendar. As the emails in Jo Desire's case show, the Department of Justice is well aware of the importance of this issue: if people cannot litigate unless they are returned, and DHS sets up policy and practical obstacles to return, then many people who win their cases are effectively denied any benefit of judicial review. Nonetheless, the Department of Justice continues to pretend that the ICE directive is adequate to assure relief for petitioners who win their cases in court.

---

[40] Resp. Mot. to Dismiss for Lack of Jurisdiction, *Hernandez-Anaya v. Holder*, No. 12-73139, at 9 (9th Cir. Aug. 16, 2013) ("Before the Court is only the issue of whether Hernandez's removal to Mexico should be deferred [based on withholding of removal]. Yet Hernandez fails to explain how his removal to Mexico can be deferred, when he has already been removed to Mexico.").

Attorneys have reported having their clients' cases administratively closed after winning a petition for review, because immigration judges viewed those cases as inactive until the immigrants returned to the U.S. In one case, Steven was removed to El Salvador while his case was pending at the Ninth Circuit.[41]  When he won his case in court, and his case was remanded to an immigration judge, Steven tried to fight his removal case from abroad.[42] However, when Steven sought to litigate his case from El Salvador, the immigration judge presiding over his case had it administratively closed because Steven was not in the U.S.[43] Frustrated by the judge's action, his attorney persuaded the ICE attorney to jointly move to have the case re-calendared. This is not a procedural action a pro se client would have been able to execute and it depended on the assent of the ICE attorney. Ultimately, the judge did re-calendar the case, but because Steven is not physically present in the United State to fight his case, the judge still considers his case a non-priority.[44] This situation leaves Steven in legal limbo—unable to litigate his case without returning, but facing enormous impediments to return.

Another example of the administrative closure problem is the case of Gideon Idowu. Gideon is an asylum-seeker from Nigeria who had worked as a contract linguist for the FBI; he feared that if he returned to Nigeria, he would be targeted by the organized crime figures he had helped investigate and prosecute.[45] Despite his predicament, ICE removed him to Nigeria, where he did face threats from organized crime members.[46] After fighting for several years to get his

---

[41] This petitioner's name has been changed in order to preserve his privacy.
[42] Interview with Holly Cooper, on file with author.
[43] *Id.*
[44] *Id.*
[45] Mot. Reopen Removal Proceedings and Rescind *In Absentia* Removal Order at 1, *Matter of Idowu* (EOIR Apr. 5, 2012), on file with authors.
[46] *Id.* at 4.

case reopened and appealing his case to the circuit court,[47] an immigration judge reopened his case in 2013. Upon reopening the case, though, the judge stated, "[A]s the Court is without authority to order Respondent returned to the United States, the Court will not set another hearing as it appears that would be futile. Rather, the Court finds the best course of action is to administratively close Respondent's proceedings."[48] Worse, ICE then argued that Gideon's case should be terminated, leading the judge to terminate Gideon's proceedings rather than adjudicate his asylum claim.[49] This case illustrates the same critical obstacle as Steven's—when an immigrant has ongoing removal proceedings before an immigration judge while he is outside the country, the immigration judge will many times administratively close the case rather than allow the immigrant to have his day in court. Ultimately, Gideon benefited from a strong pro bono attorney who helped him to persuade ICE to file a joint motion to reconsider the immigration judge's termination.[50] After vigorous advocacy, he was returned to the U.S. to continue his asylum case.[51]

These stories, and news from other practitioners that immigration judges have administratively closed certain cases when petitioners are abroad, highlight how EOIR often will not hear cases when noncitizens are outside of the United States.[52] Cases like these undermine the entire notion that noncitizens will not suffer irreparable harm after being removed— regardless of what the ICE Directive states, if noncitizens are not assured return and cannot even

---

[47] *See Idowu v. Attorney Gen. of the United States*, No. 12-12937 (11th Cir.).

[48] Decision And Order Of The Court, *Matter of Idowu* (EOIR Apr. 1, 2013), on file with authors.

[49] Letter of Jessica Chicco, on file with authors.

[50] Joint Mot. to Remand, *Matter of Idowu* (EOIR Oct. 3, 2013).

[51] Letter of Jessica Chicco, on file with authors.

[52] Andrew Knapp, *supra* note 13, also reported concerns that his case would be administratively closed because his client was abroad.

litigate their cases from abroad, they are prevented from gaining the benefit of their victory at the circuit court.

From the emails about Jo Desire's case, it is clear that the Justice Department is aware of EOIR's policy on cases in which the person is out of the country. Yet, the government has so far refused to disclose the sections of these emails that state that policy. In the case of Jo Desire, the Ninth Circuit ordered the Government to apprise the court about EOIR's position on whether it retained jurisdiction in a case where the person had been removed and faced ongoing proceedings on remand.[53] Because the government reversed course, returned Jo and dropped the new proceedings, OIL avoided revealing to the courts of EOIR's view on whether it even has the power to adjudicate a case when ICE refuses to return a noncitizen that prevailed in the courts.

Although the exact contours of EOIR's current position remain unknown, the FOIA documents disclose OIL's past understanding of the ability of person to litigate from abroad. In one newly disclosed email from before *Nken*, the very OIL attorney who was the point person from the government's briefs in *Nken* refers to a case where the case was remanded to the immigration judge "who has no jurisdiction, because the guy is still in Mexico."[54] If that is in fact the current position of EOIR, it is clear that every gap in the ICE directive and every practical hurdle to return leads to an impossible situation in which persons who win their cases are deprived of relief.

Besides destroying a valid form of relief for some petitioners, the stance of immigration courts that will not adjudicate cases of those who have prevailed in the courts directly contravenes the Supreme Court's logic in *Nken*, which underpins the entirety of the current

---

[53] Order of the Court *in Desire v. Holder*, No. 11-15199, ECF No. 39 (9th Cir., filed May 16, 2013).

[54] FOIA document DOJ Civil 1697 (Aug. 29, 2007), on file with author).

return and stay policies. In *Nken*, the Supreme Court presumed that removal is not irreparable harm because prevailing litigants could be made whole.[55] Yet, if noncitizens are removed on the theory that they can litigate from abroad, then lose their opportunity for relief *because* they are abroad, petitioners fall into a legal black hole—there is no way for them to get the benefit of judicial review of a potentially erroneous decision to remove them.

**B. Even When Petitioners Are Eligible to Return Under the ICE Policy, the Obstacles They Face Are Enormous**

Many noncitizen petitioners also face significant practical problems when attempting to return. Even with proactive and supportive advocates at their side, petitioners have trouble returning due to inconsistent priorities between agencies, confusion within the ICE bureaucracy, lack of initiative on the part of the government, and the financial burden imposed on them which in the case of indigent petitioners, can effectively foreclose them from returning to the United States.

Attorneys surveyed for this report who succeeded in returning their clients to the U.S. note that they had trouble securing the cooperation of ICE, obtaining the right documents for their clients to re-enter the country, and finding a point person in the relevant agencies to help them start the return process.[56] The situation for unrepresented noncitizens is worse, as they may have difficulty even learning of the ICE policy. These practical barriers indicate that the government's existing procedures do not amount to a consistently effective policy for *all*

---

[55] "Before IIRIRA, courts of appeals lacked jurisdiction to review the deportation order of an alien who had already left the United States. Accordingly, an alien who appealed a decision of the BIA was typically entitled to remain in the United States for the duration of the judicial review. This was achieved through a provision providing most aliens with an automatic stay of their removal order while judicial review was pending." *Nken* at 424.

[56] In a survey of immigration attorneys conducted by the authors, the majority of those who responded stated that 1) obtaining a point of contact to assist with return, 2) securing ICE cooperation, and 3) lack of coordination between agencies were significant problems.

noncitizens, as in many cases aggressive, lengthy advocacy is necessary to ensure petitioners are returned—a quality of advocacy to which many petitioners do not have access.

### 1. Indigent Petitioners Cannot Return Under The ICE Directive

The ICE Directive requires individuals to pay the cost of their own return, creating an insurmountable hurdle for indigent petitioners. [57] These petitioners are likely to be disproportionately pro se, as they most likely would not be able to afford to pay for counsel.

Jo Desire's case illustrates this problem. Although the Ninth Circuit vacated his removal order, Jo could not return to the U.S. because he could not afford to purchase a plane ticket. Jo spent years in Haiti, where he was ill-equipped to earn the money needed to buy a plane ticket back to the United States, It was only when the government faced the possibility of having to reveal the problem Jo faced in litigating his case that it relented and arranged for Jo to be flown back on a government plane.

Jo's case highlights how the financial burden the return policy imposes on indigent petitions essentially puts them in the untenable position of winning in court yet losing the opportunity to live in the United States. The government, which chooses to use its resources to deport persons with pending appeals, has both the resources and the capability to return such individuals—but chooses not to do so.

### 2. Other Agencies Do Not Follow ICE's Directive, And Immigrants Bear The Cost Of Inter-Agency Disunity

The ICE Directive outlining the government's return policy fails to address the many other governmental actors who are necessary to return a noncitizen petitioner. Both the

---

[57] *See* ICE FAQ at ¶ 18.

Department of State and U.S. Customs and Border Protection (CBP) play critical roles in returning deported noncitizens, and coordination failures or outright refusal to cooperate by either can effectively defeat the promise of return.

The Department of State has no formal guidance ensuring its cooperation in returning noncitizens despite the crucial role that it plays in the return process. To return, a noncitizen must pick up a temporary transportation letter from an embassy or consulate (though these transportation letters are issued by DHS). The government's only action to ensure the Department of State's cooperation with ICE's return policy has been a single cable sent in April 2012 to embassies and consular offices, requesting that officials refer return inquiries to ICE and await parole notification.[58] The Department of State has not codified it in the Foreign Affairs Manual—the Department's official operative directives—or incorporated it within any other permanent policy directive.[59] Because noncitizens are often returning in order to attend immigration hearings, timing is essential—a delay could seriously harm the case.[60] In the case of Marta, a transportation letter sat in the mailroom of an embassy for days before staff discovered that the noncitizen was in fact authorized by ICE to return.[61] In that case, Marta—who has since received cancellation of removal under the Violence Against Women Act—was scheduled to return to the U.S. after winning her case before a circuit court. A local ICE officer mailed the transportation letter to the embassy eleven days before Marta was scheduled to return. It was only through the attorney's follow-up calls and pressure that the embassy attaché found the letter, on the day that Marta was scheduled to leave. Her hearing in immigration court in the

---

[58] *See* Cable from Secretary of State to All Diplomatic and Consular Posts 40718 (Apr. 24, 2012), SG Ltr., Appx. E.
[59] *See Foreign Affairs Manual*, *available at* http://www.state.gov/m/a/dir/regs/fam/.
[60] Letter of Bruce Nestor, on file with author.
[61] *Id.* The name of this petitioner has been changed in order to preserve her privacy.

U.S. was the next day.[62] Had she missed her hearing, she could have faced serious consequences, including removal in absentia—essentially losing her removal case. Had she been pro se, it is likely that the letter would never have been discovered, and she would have missed her court date. Marta's case is one example of how bureaucratic obstacles at the level of the embassy or consulate could have not only delayed her return to the United States, but imperiled her removal case entirely.

Even if a petitioner obtained all necessary documentation, there is no assurance that CBP officers would permit the petitioner entry into the United States. The ICE Directive authorizes parole as the mechanism through which prevailing noncitizens are allowed to enter the U.S.[63] This use of parole is problematic in that parolees may be treated as arriving aliens and therefore subject to grounds of inadmissibility under 8 U.S.C. § 1182(a) and detention without a bond hearing.[64] Moreover, CBP's parole procedures were never designed for the return policy or for these kinds of cases, so CBP's instructions on parole still provide that border officials can override a prior decision to grant entry into the United States.[65]

In addition, CBP and private airlines may not recognize the transportation letter petitioners use to return to the U.S., thus delaying or perhaps preventing petitioners' return. In the case of Vladimir Perez Santana, airline staff in the country of origin did not recognize the transportation letter as a valid document, and would not let Vladimir on the plane. Vladimir is an

---

[62] *Id.*
[63] Directive 11061.1 ¶ 3.1.
[64] *See* 8 C.F.R. § 1003.19(h)(2)(i)(B).
[65] *See* CBP Directive No. 3340-043, The Exercise of Discretionary Authority, *available at* http://www.nationalimmigrationproject.org/legalresources/NIPNLG_v_DHS/CBP%20Parole%2 0Directive%20(Partially%20Redacted)%20-%20Sept%203%202008.pdf.

LPR who had been living in the United States since he was ten years old.[66] He was convicted of a marijuana offense and removed to the Dominican Republic. During his post-deportation exile, the Supreme Court decided *Moncrieffe v. Holder*, 133 S. Ct. 1678 (2013), in which it found that an analogous marijuana sale offense was not an aggravated felony. With the help of a dedicated attorney, Vladimir appealed to the First Circuit and, on remand, the Board of Immigration Appeals reopened his immigration case.[67] When he attempted to return five months later—after assembling the necessary documentation and payment, including a transportation letter from the State Department—he could not board the plane. Flying out in a timely manner is especially pressing because transportation letters expire quickly. Vladimir was lucky enough to have counsel, who could call and advocate for him to board a plane the next day.[68] But for pro se petitioners, a setback like this can pose an enormous bureaucratic obstacle petitioners have no experience in navigating.

Another example of how bureaucratic hurdles pose a significant problem for petitioners is the case of Andrew, a petitioner with LPR status who was removed to Haiti.[69] By chance, Andrew met a lawyer who specialized in immigration matters when both volunteered for relief efforts in the aftermath of the earthquake in Haiti in 2010.[70] After a review of Andrew's A-file, his lawyer filed a motion to reopen on a claim of ineffective assistance of counsel.[71] The judge granted the motion and remanded the case to the BIA. Andrew's lawyer attempted to coordinate

---

[66] *Santana v. Holder*, 731 F.3d 50, 51 (1st Cir. 2013).

[67] *Id.*

[68] Letter of Kathleen Gillespie, on file with author.

[69] Interview with Holly Cooper, on file with author. The name of this petitioner has been changed in order to preserve his privacy.

[70] *Id.*

[71] Although Andrew's case proceeded on a motion to reopen rather than petition for review, the same bureaucratic challenges are present.

with EOIR and ICE to bring him back due to the type of relief they sought—Andrew's personal testimony would be key to getting relief.[72] After weeks of communication, the assistant ICE field director informed Andrew's lawyer on a Thursday evening that Andrew had an appointment with the U.S. embassy in Haiti the following Monday morning, and that his flight would depart to the U.S. that Monday afternoon.[73]

Andrew's lawyer knew that the U.S. embassy in Haiti was chaotic, and that it was extremely unlikely that Andrew would get his documents in time to make his afternoon flight.[74] The travel document would only be valid for a short period of time and Andrew and his lawyer already had purchased the airline ticket, so they needed to get his travel document Monday morning. The attorney personally flew down to Port Au Prince in order to go to the embassy with Andrew. Describing the morning of the consulate appointment, she said, "[I]n Haiti . . . just driving a mile can take an hour. . . .There were around 300 people in the embassy and I pushed my way to the front."[75] Luckily, when she spoke to an officer regarding Andrew's travel document, it was produced within 1.5 hours. At the airport in Port Au Prince and in the U.S., the attorney advocated for Andrew when interacting with border agents to ensure that he got through.[76] Without her insistent and extraordinary efforts, it is entirely possible Andrew would not have been able to enter at all, imperiling his merits case. If Andrew had not been able to return, he may have never been able to fully realize the benefit of his win on appeal by having his case fully heard on remand.

---

[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*

Similarly, Edward, the U visa recipient who had been wrongfully removed as a person without status, faced bureaucratic obstacles even once he was approved to return. After ICE officers agreed to bring Edward back through advance parole, it was a haphazard process. First, although Edward had a valid Mexican passport when he was first deported, the passport expired by the time ICE scheduled his return.[77] Although advance parole allows an individual to return to the US without a passport, CBP told Edward that since his had expired, he would have to obtain a new one. This forced Edward to travel thousands of miles back to the town of his birth in order to obtain a new passport.[78] Due to corruption in the passport office of his hometown, Edward had difficulty obtaining a new passport as he could not afford to bribe the passport officers. Unable to obtain a new passport, he returned to the border only to be told that a passport was not necessary for his return.[79] CBP's confusion cost Edward significant time and effort, and is indicative of the widespread bureaucratic miscommunication that creates barriers to return.

### 3. ICE Decentralization Makes Coordinating Action Difficult, And ICE Discretion Makes Return Uncertain For Noncitizens

Even within ICE, the Directive vests power in local offices and is dependent on a makeshift organizational structure to coordinate local action. Because the ICE Directive does not specify a central office to supervise all aspects of a return from the flight to providing the necessary documents, it is practice for local ICE officers to make these determinations. This makeshift process effectively hands control over returning a successful petitioner to the same agency responsible for having removed the individual.[80]

---

[77] Knapp, *supra* note 13.

[78] *Id.*

[79] *Id.*

[80] ICE FAQ ¶¶ 9-10 (noting merely that a request submitted to ERO Outreach, the central ICE community liaison office, to be returned will be routed to the "appropriate ICE offices").

ICE reserves for itself the right to determine when and under what circumstances to return non-LPRs due to the unrestricted scope of the language in the ICE Directive. ICE retains the discretion to determine whether returning non-LPRs is "necessary for continued administrative proceedings." Consequently, the same agency that executes a petitioner's removal also has the discretionary power to not to return her, which would deny her the ability to testify in her own defense. This broad language grants ICE, a party to the removal proceeding, unfettered discretion to refuse to return a successful litigant and gives ICE the power to force a petitioner to proceed with her case from abroad.[81]

Even for LPRs, in ICE's view, ICE agents have the discretion to override the Directive's policy statement on return if they desire. The ICE Directive vests final discretion in ICE officers due to the open-ended nature of some of its terms. It states that it will return individuals who are restored to LPR status "absent extraordinary circumstances," but does not define which circumstances are extraordinary or who is responsible for making that determination.[82] The ICE FAQ document elaborating on the government's policy is similarly unhelpful, defining "extraordinary circumstances" as those that "include, *but are not limited to*, situations where the return of the alien presents serious national security considerations or serious adverse foreign policy considerations."[83] Both "national security considerations" and "adverse foreign policy considerations" are broad and undefined concepts. Beyond this, ICE acknowledges that "extraordinary circumstances" are "not limited to" the already broad universes of national

---

[81] *Accord Marin-Rodriguez v. Holder*, 612 F.3d 591, 593 (7th Cir. 2010) ("It is unnatural to speak of one litigant withdrawing another's motion").

[82] ICE Directive 11061.1 ¶ 2.

[83] ICE FAQ ¶ 3, http://www.ice.gov/about/offices/enforcement-removal-operations/ero-outreach/faq.htm (emphasis added).

security and foreign policy, leaving the term open-ended.[84]   The Department of Justice reinforces this view of agency discretion.  In one newly released email from 2013, the "OIL Director" states that "since the petitioner is a former LPR, ICE *may* be obliged to facilitate his return to the US if the case is remanded."   The email continues that this should be noted in the email to ICE.[85] Tellingly, OIL did not direct ICE that it would be obliged to facilitate return for the former LPR.

The lack of coordination and high levels of discretion afforded ICE officers allow considerable room for ICE agents to contradict their own policy. One example is the case of Philip, a lawful permanent resident of the U.S. who has resided in the United States since 1966.[86] Philip was charged with an aggravated felony and removed to Serbia. With the help of an attorney, he filed a petition for review, which was granted by the Seventh Circuit.[87] His case has now been remanded to the BIA for further proceedings. Given that Philip's case has been remanded, he should be able to return. The ICE Directive specifically states that LPRs will be returned and their status restored "absent extraordinary circumstances."[88] However, when Philip's lawyer attempted to coordinate his return to the United States with an ICE-ERO (Enforcement and Removal Operations) officer, she was stonewalled. The officer stated, "After consultation with the Office of Chief Counsel (OCC), the request to facilitate the respondent's return is premature. ERO does not facilitate the return to the United States of an alien whose case is pending on appeal at the Board."[89] This directly contradicts the ICE Directive, and it forces to Philip to wait even longer to return, despite waiting abroad during his lengthy appeal process.

---

[84] *Id.*
[85] FOIA documents, DOJ-Civil 1200 (May 8, 2013), on file with author.
[86] Letter of Maria Baldini, on file with author. This petitioner's name has been changed in order to preserve his privacy.
[87] *Id.*
[88] ICE Directive 11061.1.
[89] Baldini, *supra* note 68.

Cases like Philip's demonstrate how even long-time lawful permanent residents can have their ability to return to the U.S. obstructed by the open-ended language of the ICE Directive.

The Directive suggests that ICE will coordinate its efforts through the Public Advocate. But the position of the Public Advocate was defunded by Congress in 2013, and members of Congress continue to criticize any effort to fund an alternative office to serve even its coordinating function.[90]

## III. In Light Of The Government's Ongoing Unwillingness To Provide a Comprehensive and Workable Return Policy, Courts Must Clarify That Removal Constitutes Irreparable Harm

Circuit courts have the ability—and responsibility—to consider the existing inadequacies of the return policy and evaluate whether those inadequacies are significant enough that courts should categorically presume that removal is an irreparable harm. In *Nken*, the Supreme Court envisioned return practices and procedures that would allow a prevailing petitioner to return to continue fighting her case in the U.S. Such practices and procedures did not exist then, and do not exist now. Case law shows that when an erroneous statement is made in a judicial opinion, that statement need not be considered binding on lower courts.

Moreover, only courts can act to make clear the correct application of the stay standard in light of the government's misrepresentation statement of law in in *Nken*—not ICE or the Office of Immigration Litigation (OIL) as ICE's representative. Though it is now clear that the irreparable harm language in *Nken* was based on a misrepresentation—and that even today, effective return procedures do not exist that would support the erroneous *Nken* language— petitioners, attorneys, and even courts are left to rely on *Nken*'s mistaken language. Without

---

[90] See H.R. 3732, 113th Cong. § 1 (2013), available at:
https://beta.congress.gov/113/bills/hr3732/BILLS-113hr3732ih.pdf

action by courts, no correction to the erroneous language in *Nken* can be discovered by ordinary means of legal research.

It is appropriate for courts to issue opinions clarifying the irreparable harm standard in light of the Government's actual return policy. In circumstances where language in a prior case was on an issue not fully litigated, was mistaken, or was dicta, that language is not binding on courts. As the Supreme Court long has recognized, *stare decisis* is not applicable unless the issue was "squarely addressed" in the prior decision.[91] Moreover, as the Ninth Circuit has recognized, unstated assumptions on non-litigated issues are not precedential holdings that bind future decisions.[92] The Court's analysis of the irreparable harm prong of the stay standard in *Nken* and its statement that removal did not cause irreparable harm because "those who prevail can be afforded effective relief by facilitation of their return"[93] were predicated on a significant mistake of fact, and therefore have no binding force. Thus, circuit courts have the ability to issue a new opinion free from the constraints of the erroneous language in *Nken*.

In addition, circuit courts have the responsibility to issue such an opinion. Litigants and courts, especially pro se litigants, look to court opinions to understand legal standards. When the only available judicial discussion is based on a misstatement, both parties and courts can be

---

[91] *See Brecht v. Abrahamson*, 507 U.S. 619, 630-31 (1993). *See also Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents") (citations omitted)**;** *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006) ("We are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated"); *Humphrey's Executor v. United States,* 295 U.S. 602, 627–628, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (rejecting dicta, "[W]hich may be followed if sufficiently persuasive but which are not controlling").

[92] *See Gonzales v. Dep't of Homeland Sec.*, 508 F .3d 1227, 1234 (2007); *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985); *Matter of Baker*, 693 F .2d 925, 925-26 (9th Cir. 1982).

[93] *Nken*, 556 U.S. at 434.

misled about the risks of removal pending a petition for review. A published opinion is necessary in order to ensure that noncitizens are provided with a meaningful opportunity to seek a stay and thereby a meaningful access to relief following judicial review. Such an opinion must acknowledge the *Nken* misrepresentation and establish that removal is presumptively an irreparable harm so long as the government's return policy is inadequate. In the high stakes scenario of stays of removal – where the government seeks to remove a petitioner before the court has adjudicated the legality of the removal – any limitation on return for a prevailing petitioner is not merely a setback, but an effective denial of meaningful judicial relief. As this report shows, the current policy cannot assure the return of all petitioners who prevail. In order to avoid rendering the judicial review process a nullity, courts must consider the litigant's actual effective ability to return when it evaluates the existence of irreparable harm.

As the Supreme Court emphasized in *Nken*, the efficacy of judicial review for noncitizen petitioners hinges on the ability of the petitioner to return.[94] In order to protect the efficacy of judicial review, circuit courts should take affirmative steps to resolve the problem of ineffective return, rather than waiting for DHS to improve its policy or for OIL to properly brief the issue.

**Conclusion**

Given the gross inadequacy of the government's return policy and the problematic state of the law since *Nken*, it is all the more crucial for the circuit courts to reassess their application of the irreparable harm prong of the stay standard. Unlike the Court's understanding during *Nken*, it is now known that the government does not have effective practices and procedures for returning noncitizens who win on appeal—even after the 2012 ICE directive. This change justifies circuit courts in revisiting the irreparable harm analysis, and finding that in order to

---

[94] *Nken v. Holder*, 556 U.S. 418, 434 (2009).

protect meaningful access to judicial review unless and until all parts of the government create a workable return policy that assures that prevailing petitioners can enjoy the benefits of judicial review, removal should be understood as an irreparable harm.