## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                               )
LIA DEVITRI, et al.,           )
                               )
          Petitioners/Plaintiffs, )
                               )
     v.                        )          Civil Action
                               )          No. 17-11842-PBS
CHRIS CRONEN, et al.,          )
                               )
          Respondents/Defendants. )
_____)
```

## MEMORANDUM AND ORDER

February 1, 2018

Saris, C.J.

## INTRODUCTION

Petitioners[1] are fifty[2] Indonesian Christians subject to
final Orders of Removal. Residing with Government permission in
New Hampshire under a humanitarian program called "Operation
Indonesian Surrender," they have complied with the conditions of
their Orders of Supervision, some for more than a decade. Last
summer, the Government informed them that the program was being
terminated, and they were ordered to return to Indonesia within

---

[1]    Petitioners filed this as a putative class action. The
Court has not certified a class.

[2]    Bobby Candra was withdrawn from this action on January 19,
2018. See Docket No. 83.

sixty days. Petitioners now seek to file[3] motions to reopen their immigration proceedings based on "changed country conditions," on the ground that they are likely to face persecution or torture in Indonesia because of their Christian faith. Challenging their lack of meaningful access to the motion to reopen procedure as a violation of the Due Process Clause of the Fifth Amendment and contrary to the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT"),[4] Petitioners assert jurisdiction under 28 U.S.C. § 2241, 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 701 et seq. They contend they will be removed to Indonesia before they have sufficient time to file a motion to reopen and before the motion to reopen is ruled on by the BIA and First Circuit. Accordingly, they seek a preliminary injunction staying their removal.

The Government argues that Petitioners seek to circumvent Congress's immigration framework. They re-assert that this Court

---

[3]    At the time of this Memorandum and Order, the Court is aware of two Petitioners who have motions to reopen based on changed country conditions pending before the Board of Immigration Appeals ("BIA").

[4]    Two counts survive from Petitioners' Second Amended Complaint ("SAC") (Docket No. 44): Count I under the INA, 8 U.S.C. § 1101 et seq., and Count II under the Due Process Clause of the Fifth Amendment. The Court dismissed without prejudice Count III, which related to the unlawful detention of Petitioner Terry Rombot, in its order on jurisdiction because it was addressed in a separate action. See Docket No. 65 at 22; see also Rombot v. Souza, 1:17-cv-11577-PBS, Docket No. 49; Docket No. 52.

lacks jurisdiction, that Petitioners do not show that they are likely to be removed before the administrative courts can adjudicate their motions to stay removal, and that they have not shown that they are each likely to face torture or persecution as a result of removal.

After a hearing, the Court **ALLOWS** the motion for preliminary injunction (Docket No. 3) staying removal to the extent provided below.

### BACKGROUND

The Court assumes familiarity with its November 27, 2017 order on jurisdiction (Docket No. 65, Devitri v. Cronen, Civ. No. 17-11842-PBS, 2017 WL 5707528 (D. Mass. Nov. 27, 2017), and only briefly summarizes the relevant background information here.

I.   **Factual Background**

A.   **The Humanitarian Program**

Petitioners are Christian Indonesian nationals who have lived in New Hampshire for many years (some for over a decade), but are subject to final Orders of Removal. In 2010, Immigration and Customs Enforcement ("ICE") instituted a humanitarian program called "Operation Indonesian Surrender" in New Hampshire. Petitioners and other Indonesian nationals with final Orders of Removal were encouraged to come "out of the shadows" and identify themselves to ICE during the program. In exchange,

they were granted temporary stays of removal and placed under Orders of Supervision ("OSUPs"). These OSUPs allowed them to seek employment and also prescribed conditions with which the recipients had to comply. Petitioners lived and worked under these OSUPs without incident until 2017 and generally complied with their conditions.

The Government never made any promises or agreements that the program participants could stay in the country indefinitely. However, nothing in the record suggests that Petitioners were notified that they would forfeit the right to assert changed country conditions if they did not file motions to reopen while they participated in Operation Indonesian Surrender. They reasonably relied on their OSUPs in not filing motions to reopen earlier and had no reason to suspect that the Government would abruptly change its mind about the humanitarian program.

On August 1, 2017, a group of Petitioners checked in with ICE pursuant to the conditions of their OSUPs. They were informed that they would be subject to a "thirty-thirty" deportation schedule: they would have to depart for Indonesia no later than thirty days after their upcoming thirty-day check-in appointment (i.e., sixty days from August 1, 2017).

B.   **Fears of Persecution**

Petitioners' expert, Jeffrey Winters, Ph.D., states that Indonesian society has recently faced a "rising tide of

extremist Islam." Winters Aff. (Docket No. 49-6) ¶ 8. Petitioners have presented evidence that they may face "intimidation, physical harm, and threats to their personal safety and well-being," based on their Christian religion, if they returned to Indonesia. Winters Aff. (Docket No. 49-6) ¶ 2. According to Dr. Winters, since 2012, the level of violence and intolerance directed at religious minorities has increased at a "shocking rate," and Christian Indonesians face an "extremely high probability of persecution." Winters Supp. Aff. (Docket No. 88-1) ¶ 2.

Dr. Winters's supplemental affidavit further states that law enforcement in Indonesia is unlikely to provide meaningful protection to religious minorities -- and Evangelical Christians, like Petitioners, in particular -- in the face of violence and intolerance. See Winters Supp. Aff. (Docket No. 88-1) ¶¶ 14, 33. He writes that "the Indonesian government actively supports Islamic extremists who are anti-Christian" and "will punish those who are 'vocal' and 'assertive' Christians, such as Plaintiffs." Winters Supp. Aff. (Docket No. 88-1) ¶ 6. Dr. Winters also cites a 2013 United States government report, which found that the Indonesian government "did not enforce laws that would protect vulnerable groups and religions" and "collaborated with hardline groups against members of sects they deemed to be 'deviant.'" Winters Aff. (Docket No. 49-6) ¶ 108.

His supplemental affidavit also includes articles covering this case in the media in Indonesia. See Winters Supp. Aff. (Docket No. 88-1) Ex. A. Although names of some of the Petitioners are mentioned in media coverage, Petitioners have presented no affidavits about their individual situations.

## II.   **BIA Procedures**

Congress created a statutory right for each alien to file a motion to reopen immigration proceedings. See 8 U.S.C. § 1229a(c)(7)(A); Perez Santana v. Holder, 731 F.3d 50, 51 (1st Cir. 2013). Based on the alleged changed conditions in Indonesia, Petitioners seek to file motions to reopen with the BIA.[5] See 8 U.S.C. § 1229a(c)(7)(C)(ii) ("There is no time limit on the filing of a motion to reopen . . . based on changed country conditions . . . .").

Petitioners may request from the BIA a stay of their removal pending a ruling on the motion to reopen. A stay is discretionary. See Gearin Decl. (Docket No. 36-2) ¶ 7. A stay request can only be submitted to the BIA if the individual previously filed or contemporaneously files a motion to reopen. See BIA Practice Manual § 6.4(b). The BIA "categorizes stay requests into two categories: emergency and non-emergency." Id.

---

[5]   Only two named Petitioners will be filing their motions to reopen with the Immigration Court, according to Petitioners. See Docket No. 72 at 4 n.4.

§ 6.4(d). But the BIA does not consider stay requests on an immediate "emergency" basis unless removal is imminent and the individual is in ICE's physical custody. Gearin Decl. (Docket No. 36-2) ¶¶ 8-9; accord BIA Practice Manual § 6.4(d)(i). Petitioners are not in physical custody, so the BIA's emergency stay procedures would not apply to them.

Instead, Petitioners would be subject to the "non-emergency" stay procedures. The BIA's practice manual states that it "does not rule immediately on a 'non-emergency' stay request, but considers the request during the normal course of adjudication." BIA Practice Manual § 6.4(d)(ii). In practice, the BIA often does not rule on non-emergency stay requests from non-detained individuals. See Chan Decl. (Docket No. 72-2) ¶ 12; Mesa Aff. (Docket No. 72-6) ¶¶ 7-8; Piereson Aff. (Docket No. 72-7) ¶ 11. When the BIA does rule on non-emergency stay requests, it typically does so at the same time that it decides the motion to reopen. See Greenstein Aff. (Docket No. 72-3) ¶ 19. Even if the BIA rules on the motion for a stay and denies it, there is no right to appeal the stay denial until the BIA also rules on the motion to reopen. See Gando-Coello v. I.N.S., 857 F.2d 25, 26 (1st Cir. 1988) (holding that BIA's denial of

stay pending disposition of motion to reopen is not a final administrative order reviewable by Court of Appeals).[6]

In sum, absent a judicial stay, contrary to the Government's assertions, I find that it is likely that Petitioners will be deported to Indonesia <u>before</u> their motions to stay and motions to reopen are considered by the BIA and the Court of Appeals.[7]

## DISCUSSION

I.  **Preliminary Injunction**

    A.  **Legal Standard**

In order to be granted a preliminary injunction, a plaintiff must show the Court "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

---

[6]     The First Circuit has held that there is a right to pursue a post-removal motion to reopen in the BIA and Court of Appeals. <u>See</u> <u>Perez Santana</u>, 731 F.3d at 51.

[7]     Two Petitioners will file with the Immigration Court, which has different procedures. As discussed in the Court's earlier decision in this case, the Immigration Court will consider motions for stays from non-detained persons. While the Government hints that an Immigration Judge's denial of a stay request may not be appealed to the BIA until the motion to reopen is adjudicated, <u>see</u> Dufresne Decl. (Docket No. 36-1) ¶ 12, the parties have not fully briefed the issue of whether the BIA may review an Immigration Court's denial of a motion to stay.

_Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc._, 645
F.3d 26, 32 (1st Cir. 2011) (quoting _Winter v. Natural Res. Def._
_Council, Inc._, 555 U.S. 7, 20 (2008)). "The sine qua non of this
four-part inquiry is likelihood of success on the merits: if the
moving party cannot demonstrate that he is likely to succeed in
his quest, the remaining factors become matters of idle
curiosity." _New Comm Wireless Servs., Inc. v. SprintCom, Inc._,
287 F.3d 1, 9 (1st Cir. 2002).

   **B.   Likelihood of Success on the Merits**

   In arguing that Petitioners are not likely to succeed on
the merits, the Government primarily returns to its challenge to
this Court's jurisdiction, which the Court has already rejected.

   The Government's central argument is that the motion to
reopen process is an adequate administrative alternative to
habeas corpus relief, and therefore the jurisdiction-stripping
language in 8 U.S.C. § 1252(g)[8] does not violate the Suspension

---

[8]   The relevant language from 8 U.S.C. § 1252(g) reads:

> "Except as provided in this section and
> notwithstanding any other provision of law
> (statutory or nonstatutory), including
> section 2241 of Title 28, or any other habeas
> corpus provision, . . . no court shall have
> jurisdiction to hear any cause or claim by or
> on behalf of any alien arising from the
> decision or action by the [Secretary of
> Homeland Security] to . . . execute removal
> orders against any alien . . . ."

Clause of the United States Constitution.[9] Congress may provide adequate substitutes for habeas corpus without offending the Suspension Clause. See I.N.S. v. St. Cyr, 533 U.S. 289, 314 n.38 (2001) ("Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals."); Swain v. Pressley, 430 U.S. 372, 381 (1977) (holding that "the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus"). Generally speaking, circuits have rejected Suspension Clause challenges on the ground that a motion to reopen plus a petition for review in the court of appeals would be an adequate substitute for habeas corpus. See, e.g., Iasu v. Smith, 511 F.3d 881, 893 (9th Cir. 2007) (rejecting as-applied challenge);

---

[9]    The Suspension Clause provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

    The Government presses an argument that Petitioners do not bring a "traditional" habeas claim under 28 U.S.C. § 2241 as historically understood because they do not seek release from physical custody. However, the Supreme Court itself has pointed out that the writ was historically used in a wide variety of circumstances, ranging from requests for freedom from the restraints of apprenticeship to challenging the refusal to let an immigrant leave a ship and land on shore. See I.N.S. v. St. Cyr, 533 U.S. 289, 301-03, 305-06 (2001); see also Saint Fort v. Ashcroft, 329 F.3d 191, 197 (1st Cir. 2003) ("The writ of habeas corpus has been employed by non-citizens for centuries in both the United States and Britain.").

Mohamed v. Gonzales, 477 F.3d 522, 526 (8th Cir. 2007) (same); Alexandre v. U.S. Att'y Gen., 452 F.3d 1204, 1206 (11th Cir. 2006) (per curiam) (rejecting facial challenge).

Acknowledging this line of cases, Petitioners vigorously contend that the motion to reopen and review procedure violates the Suspension Clause as applied to their cases because it is not an adequate substitute to habeas relief in changed-country-condition cases where a petitioner raises a non-frivolous claim that he will be persecuted after removal but before the motion to reopen can be ruled on by the BIA and Court of Appeals. The Court previously found that the Immigration Court's procedures for adjudicating motions to reopen and motions to stay "typically are an adequate and effective administrative alternative to habeas corpus relief consistent with the Suspension Clause." Docket No. 65 at 19. However, the Court did not address the adequacy of the opportunity for judicial review. The Court also reserved the question of whether the BIA's procedures are an adequate and effective substitute for habeas relief for these Petitioners. See Docket No. 65 at 19.

On the fuller record now before the Court, I find that the BIA's processes for adjudicating motions to reopen and motions to stay are not adequate administrative alternatives to habeas for these Petitioners. The Government has conceded that Petitioners -- who are not in custody -- would not be subject to

11

the BIA's emergency stay procedures. Gearin Decl. (Docket No. 36-2) ¶¶ 8-9; accord BIA Practice Manual § 6.4(d)(i). Petitioners have provided persuasive evidence demonstrating that it is likely that the BIA will not rule on their non-emergency motions to stay before they are deported. See Chan Decl. (Docket No. 72-2) ¶ 12; Mesa Aff. (Docket No. 72-6) ¶¶ 7-8; Piereson Aff. (Docket No. 72-7) ¶ 11; Realmuto Aff. (Docket No. 49-5) ¶ 21; cf. Greenstein Aff. (Docket No. 72-3) ¶ 19 (explaining that, when BIA does rule on a non-emergency stay motion, it does so "at the same time that it adjudicates the motion to reopen, essentially rendering the stay request moot"). Thus, under this Kafkaesque[10] procedure, they will be removed back to the very country where they fear persecution and torture while awaiting a decision on whether they should be subject to removal because of their fears of persecution and torture. Petitioners have proven by a preponderance of the evidence that the BIA's procedures will not be adequate to protect their due process rights and their rights under asylum law, the CAT, and the INA. Thus, as applied to the circumstances of this case, 8 U.S.C. § 1252(g) is a violation of the Suspension Clause, and this Court has habeas and federal-question jurisdiction over Petitioners' statutory and Constitutional claims.

---

[10]   See Franz Kafka, The Trial (1925) (telling story of a man arrested and prosecuted by a remote, inaccessible authority).

Citing 8 U.S.C. § 1252(a)(1) and (b)(3)(B), the Government also argues that the federal courts of appeals "have ample authority to halt the execution of a removal order." Docket No. 68 at 7. But that is not true, because the circuit courts only have jurisdiction over a denial of a motion to reopen, see Gando-Coello, 857 F.2d at 26 (holding that court of appeals' jurisdiction does not attach until there is a final administrative order), which can happen after removal, see Diaz v. Sessions, No. 17-3669, 2018 WL 443879, at *2 (6th Cir. Jan. 17, 2018) (noting that BIA denied petitioner's motion to reopen approximately one month after she was removed to Mexico). As the Government acknowledges, meaningful judicial review is critical to a finding that a statutory scheme provides an adequate substitute for habeas relief. See St. Cyr, 533 U.S. at 314 n.38.

Plaintiffs allege that removing Petitioners without giving them access to the motion to reopen process -- "their core procedural entitlement" -- "violates [the] due process guarantee of the Fifth Amendment." SAC ¶ 108. The Fifth Amendment's Due Process Clause mandates that "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law." U.S. Const. amend. V. As a starting point, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S.

678, 693 (2001). "[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292, 306 (1993) (citing The Japanese Immigrant Case, 189 U.S. 86, 100-01 (1903)). The Due Process Clause also protects an alien subject to a final order of deportation, "though the nature of that protection may vary depending upon status and circumstance." Zadvydas, 533 U.S. at 693-94.

A cognizable liberty or property interest is a prerequisite to a colorable due process claim. Jupiter v. Ashcroft, 396 F.3d 487, 492 (1st Cir. 2005) (citing Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976)). In 8 U.S.C. § 1229a(c)(7), Congress codified the right to file one motion to reopen and created a statutory form of relief available to an alien. Dada v. Mukasey, 554 U.S. 1, 4-5 (2008). Generally, a non-citizen may not base a due process claim on a denial of a motion to reopen because the discretionary relief of reopening immigration proceedings is not an entitlement or right. See Naeem v. Gonzales, 469 F.3d 33, 38-39 (1st Cir. 2006) (rejecting due process claim for denial of motion to reopen based on wife's naturalization).

Here, there is a statutory right to move to reopen and an entitlement to not be deported to a country where persecution would occur. See 8 U.S.C. § 1231(b)(3)(A) (mandating that ICE "may not remove an alien to a country if . . . the alien's life or freedom would be threatened in that country because of the

14

alien's . . . religion").[11] Thus, Petitioners do have a significant interest in the right to file a motion to reopen and the opportunity to have their fears of persecution and torture adjudicated before removal.

For some essential entitlements, only a pre-deprivation opportunity to be heard will provide sufficient procedural due process. See Goldberg v. Kelly, 397 U.S. 254, 264 (1970); cf. 8 U.S.C. § 1229a (setting out procedures for pre-removal immigration proceedings). The legal question here is whether the right to post-removal consideration of a motion to reopen and motion to stay meets due process standards in a change of country conditions case where there is a colorable claim of persecution. In my view, such a procedure does not meet the requirements of due process because of the significance of the liberty interests at stake. See Hamama v. Adducci, 261 F. Supp.

---

[11]   This principle, known as "non-refoulement," originated in the United Nations Convention Relating to the Status of Refugees ("Convention"), which was enacted in 1951 to protect European refugees after World War II. See UNHCR, The UN Refugee Agency, The 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol 1 (2011). Article 33.1 of the Convention imposed a mandatory non-refoulement duty on the signatory states. See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 429 (1987). In 1968, the United States agreed to abide by many of the substantive provisions of the Convention. Id. Then, in 1980, Congress passed the Refugee Act, which codified the non-refoulement mandate of Article 33.1 and removed any remaining executive discretion from the process. Id. Non-citizens may assert claims for asylum and withholding of removal under 8 U.S.C. § 1231(b)(3) and the CAT in motions to reopen based on changed country conditions. See 8 C.F.R. §§ 1003.2(c)(3), 1003.23(b)(4).

3d 820, 837-38 (E.D. Mich. 2017) (holding that, in a similar case, "impeded access" to the motion to reopen procedure before removal supported likely success on due process claim). Based on the record, I find that Petitioners have proven a likelihood of success on their due process claim that they will suffer prejudice through a denial of a meaningful opportunity to have a motion to reopen and motion to stay ruled on by the BIA and Court of Appeals prior to removal to a country where they have a credible fear of persecution. See, e.g., Chan Decl. (Docket No. 72-2) ¶ 12; Mesa Aff. (Docket No. 72-6) ¶¶ 7-8; Piereson Aff. (Docket No. 72-7) ¶ 11.

### C.   Irreparable Harm

A preliminary injunction must only issue when the moving party demonstrates that it would likely suffer irreparable harm before a decision on the merits could be rendered. See Voice of the Arab World, Inc., 645 F.3d at 32 ("[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." (quoting Weinberger v. Romero-Barceló, 456 U.S. 305, 312 (1982))). A showing of possible irreparable injury is insufficient. See Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004) ("A threat that is either unlikely to materialize or purely theoretical will not do."). Instead, the moving party must show a "cognizable threat" of irreparable

harm absent a preliminary injunction. Ross-Simons of Warwick,
Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996).

The burden of removal alone cannot constitute the requisite
irreparable injury for a non-citizen. Nken v. Holder, 556 U.S.
418, 434-35 (2009) (analyzing the appropriate standard for a
stay of removal). The Supreme Court reasoned: "Aliens who are
removed may continue to pursue their petitions for review, and
those who prevail can be afforded effective relief by
facilitation of their return, along with restoration of the
immigration status they had upon removal." Id. at 435. It is not
enough to demonstrate some possibility of irreparable harm. Id.
at 434-35.

Petitioners characterize their irreparable harm as "a
significant risk of persecution and torture if they are removed
to Indonesia." Docket No. 4 at 12. The Government argues that
Petitioners' concerns about possible persecution or torture in
Indonesia are nothing but "conjecture, surmise, or . . .
unsubstantiated fears" that do not amount to irreparable harm.
Docket No. 68 at 18 (quoting Charlesbank Equity Fund II v.
Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)). Both
sides agree that the Court should not hold a hearing on the
actual conditions for Evangelical Christians in Indonesia today
to resolve this fact issue. So the question is whether the

Petitioners have put forth sufficient credible evidence to demonstrate irreparable harm.

The Government seems to suggest that Petitioners cannot establish irreparable harm because they are entitled to file and litigate motions to reopen after their removal to Indonesia. See Docket No. 68 at 14 (quoting Perez Santana, 731 F.3d at 61). But the Government's reliance on Perez Santana is misplaced because the petitioner in that case did not file his motion to reopen under a changed country conditions theory; the only basis for his motion was the vacatur of a criminal conviction. See 731 F.3d at 52. Thus, he did not face a threat of persecution upon removal.

Petitioners have presented unrebutted evidence to show that, if they were deported to Indonesia, they would face the threat of persecution or torture. Indeed, Dr. Winters states:

> While I am not able to speak to legal consequences, I wish to express in the strongest terms that if these Plaintiffs, whose stories are now well-known in Indonesia, are returned, they are highly likely to face retribution by the Indonesian authorities for having "spoken out as Christians," and will certainly never be permitted to leave Indonesia for the U.S. again. The Indonesian government is extremely sensitive about negative portrayals of the country abroad, and officials take an especially negative view of Indonesians who are the source of the criticism.

Winters Supp. Aff. (Docket No. 88-1) ¶ 5. Moreover, even if the BIA granted Petitioners' motions to reopen after their removal, they may not be able to return to the United States. See Winters

Supp. Aff. (Docket No. 88-1) ¶ 13 (stating that it is
"unrealistic to believe that these Plaintiffs will be permitted
to travel to the U.S. to participate in their reopened
immigration proceedings" if their post-removal motions to reopen
are successful); Kanstroom Aff. (Docket No. 88-2) ¶ 11 (noting
that "it is far from clear that the U.S. government would ever
actually return them"); Hoppock Aff. (Docket No. 88-3) ¶ 5
(discussing why "it is highly unlikely that Plaintiffs will be
returned" if successful on a motion to reopen). Petitioners have
also submitted evidence that this case has been covered by the
Indonesian press, which has expressly stated the names of some
of the Petitioners, see Winters Supp. Aff. (Docket No. 88-1)
Exs. A, B, and that Evangelical Christians will be targeted by
extremist groups without government protection, see Winters
Supp. Aff. (Docket No. 88-1) ¶ 14.

It is true that there is no individualized evidence
concerning the specific threats each Petitioner faces in
Indonesia. The Court is unfamiliar with the quantum of evidence
the BIA demands to meet that individualized burden, particularly
for persons who left their native country over a decade ago.
Still, based on the record, including the supplemental filings,
the Court finds that Petitioners have presented a sufficient
basis for fearing persecution to demonstrate a motion to reopen
is non-frivolous. The Court further finds that Petitioners have

demonstrated a successful motion to reopen will not necessarily result in a restoration of immigration status for many.

### D.   Balance of Equities and Public Interest

Finally, the Court must weigh the irreparable harm to Petitioners against the harm to the Government and must determine whether a preliminary injunction would be in the public interest. See Voice of the Arab World, Inc., 645 F.3d at 32. These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction. See Nken, 556 U.S. at 435 (explaining that two factors merge when court of appeals decides whether a stay of removal pending adjudication is necessary).

The Government argues that it will be irreparably injured if it is enjoined from removing these Petitioners and from effectuating the immigration statutes passed by Congress. While it is true that "[t]here is always a public interest in prompt execution of removal orders," the Supreme Court has simultaneously recognized that "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." Nken, 556 U.S. at 436. The public's interest in providing due process for non-citizens to ensure that they are not removed to a country where they will be persecuted is an extremely weighty one. Cf. Kucana v. Holder, 558 U.S. 233, 242 (2010) ("The motion

to reopen is an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." (quoting Dada, 554 U.S. at 18 (2008))).

A brief delay in unlawful deportation of residents who have lived here with Government permission for over a decade outweighs the public interest in prompt execution of removal orders, where Petitioners have been law-abiding and pose no threat to public safety.

The Government advises that "[t]he Court should allow the robust administrative process to operate as Congress intended." Docket No. 68 at 20. The Court agrees with the Government's position on this point. In entering a preliminary injunction to stay Petitioners' removal from the United States, the Court is doing no more than allowing them to use the administrative and judicial procedures that Congress designed and the Constitution requires. This injunctive relief is consistent with Congressional intent. Cf. Singh v. Gonzales, 499 F.3d 969, 979-80 (9th Cir. 2007) (noting that habeas relief in petitioner's case only would result in sufficient time to file petition for review in court of appeals, "which is consistent with Congressional intent underlying the REAL ID Act").

## II.  **A-files**

Petitioners seek their full alien files ("A-files") before filing their motions to reopen. The Government contends that

Petitioners do not need the A-files and that the Records of
Proceedings before the Immigration Court will suffice.[12]

Petitioners maintain that the A-files are necessary for
preparing the motions to reopen based on changed country
conditions to demonstrate what has "changed" for each Petitioner
individually since the original decision. See, e.g., Anker Decl.
(Docket No. 72-1) ¶¶ 10-11 (explaining that "the A-File provides
the necessary baseline for comparison" for a changed country
conditions motion); Greenstein Aff. (Docket no. 72-3) ¶ 16
(noting that the Records of Proceedings available for review in
the Immigration Court are not a sufficient substitute for the
full A-file); Realmuto Aff. (Docket No. 49-5) ¶ 10 (describing
differences between A-file and Record of Proceedings). These
affidavits are persuasive.

Immigration attorneys also have stated that counsel for
Petitioners will need six weeks to three months after receiving
the A-files to submit the motions to reopen. See Anker Decl.
(Docket No. 72-1) ¶ 13; Realmuto Aff. (Docket No. 49-5) ¶ 12.
The Court finds that this time is reasonably necessary under the

---

[12]   The Government argues that the relevant information for a
motion to reopen based on changed country conditions is
contained in the Records of Proceedings. However, counsel of
record for Petitioners were not given full access to the Records
of Proceedings. They were allowed to read the documents in the
Immigration Court, but not photocopy them. Piereson Aff. (Docket
No. 72-7) ¶ 5. The Government is seeking to remedy this
unfortunate situation. See Docket No. 87 at 2-3.

Due Process Clause, given the length of time Petitioners have been in the country and the need to investigate their individual situations if returned to Indonesia. See Hamama, 261 F. Supp. 3d at 841 (granting petitioners ninety days from receipt of A-files to submit motions to reopen in similar case). Accordingly, the stay of removal will expire for a Petitioner if the Petitioner does not file motions to reopen and to stay within ninety days after receiving the A-file.[13]

## III.  **Terms of the Injunction**

The stay[14] shall remain in effect until seven business days after the BIA rules on a timely motion to reopen. The stay will continue for this additional seven-business-day period after the BIA rules on an individual's motion to reopen so there will be a meaningful opportunity to seek a stay in the First Circuit and obtain judicial review.

---

[13]   The Court ordered production of the A-files. See Docket No. 58. In addition, most Petitioners have submitted FOIA requests for their files. See Docket No. 79. So far, the Government has served eleven A-files on December 15, 2017, six A-files on January 5, 2018, and eleven A-files on January 12, 2018. Laughlin Decl. (Docket No. 80-1) ¶ 4. Production of all remaining A-files will be completed no later than February 28, 2018. Laughlin Decl. (Docket No. 80-1) ¶ 15.

[14]   The Court is using the words "stay" and "injunction" interchangeably.

## ORDER

The Government is hereby stayed from removing any named Petitioner from the United States until one of the following conditions occurs:

(1)   If any named Petitioner fails to file a motion to reopen and motion to stay with the BIA or Immigration Court within ninety days after receiving his or her A-file, the preliminary injunction will terminate as to that particular Petitioner. If a named Petitioner fails to file a timely appeal of the Immigration Court's denial of a motion to reopen to the BIA, the stay shall terminate as to that particular Petitioner.

(2)   If any named Petitioner fails to file a motion for relief with the First Circuit within seven business days of the BIA denying his or her motion to reopen, the preliminary injunction will terminate as to that particular Petitioner.

(3)   If an appeal of a denial of a motion to reopen is filed in the First Circuit within seven business days, the stay will terminate as to that particular Petitioner unless the First Circuit orders otherwise.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge

24